MATTHEW T. DUSHOFF, ESQ.
Nevada Bar No. 004975
WILLIAM A. GONZALES, ESQ.
Nevada Bar No. 015230
**SALTZMAN MUGAN DUSHOFF**
1835 Village Center Circle
Las Vegas, Nevada 89134
Telephone:  (702) 405-8500
Facsimile:  (702) 405-8501
mdushoff@nvbusinesslaw.com
wgonzales@nvbusinesslaw.com

William G. Caldes (*pro hac vice* forthcoming)
Jeffrey L. Spector (*pro hac vice* forthcoming)
Diana J. Zinser (*pro hac vice* forthcoming)
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| BARBARA AND PHILLIP MACDOWELL, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>PERMIAN RESOURCES CORP. f/k/a CENTENNIAL RESOURCE DEVELOPMENT, INC.; CHESAPEAKE ENERGY CORPORATION; CONTINENTAL RESOURCES INC.; DIAMONDBACK ENERGY, INC.; EOG RESOURCES, INC.; HESS CORPORATION; OCCIDENTAL PETROLEUM CORPORATION; and PIONEER NATURAL RESOURCES COMPANY,<br><br>        Defendants. | Case. No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs, individually and on behalf of all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint to recover treble damages, injunctive relief, and/or other relief as appropriate, based on violations of the Sherman Act and numerous state antitrust, unfair competition, and consumer protection laws by Permian Resources Corp. f/k/a Centennial Resource Development ("Centennial"), Chesapeake Energy Corporation ("Chesapeake"), Continental Resources Inc. ("Continental"), Diamondback Energy, Inc. ("Diamondback"), EOG Resources, Inc. ("EOG"), Hess Corporation ("Hess"), Occidental Petroleum Corporation ("Occidental"), and Pioneer Natural Resources Company ("Pioneer") (collectively "Defendants").

## **NATURE OF THE ACTION**

1.     This action arises from Defendants' conspiracy to coordinate, and ultimately constrain, shale oil production in the United States, which has had the purpose and effect of fixing, raising, and maintaining the price of crude oil, and as a result, the price of heating oil ("Heating Oil" or "HO) in and throughout the United States.

2.     Shale oil, also called "tight oil," is a high-quality type of crude oil found between layers of shale rock, impermeable mudstone, or siltstone that can be extracted typically by fracturing the rock formations that contain the layers of oil through a process known as hydraulic fracturing, or "fracking." Today, shale oil comprises almost two-thirds of the onshore production of crude oil in the United States.[1]

---

[1] "The U.S. Energy Information Administration (EIA) estimates that in 2022, about 2.84 billion barrels (or about 7.79 million barrels per day) of crude oil were produced directly from tight-oil resources in the United States. This was equal to about 66% of total U.S. crude oil production in 2022." *How Much Shale (Tight) Oil is Produced in the United States?*, U.S. ENERGY INFO. ADMIN. (last updated Mar. 27, 2023), https://www.eia.gov/tools/faqs/faq.php?id=847&t=6. Crude oil supply is measured by the number of "barrels" produced, each of which contains 42 gallons of crude oil. Daily oil production is measured in barrels per day, which is at times abbreviated as bpd, but is also referred to as b/d or B/D. Production over longer periods is often measured in millions of barrels, abbreviated as MMbbl.

3.      Refineries purchase shale oil and other crude oil extracted from traditional drilling methods, co-mingle them, and then refine the oil into gasoline, diesel, and other petroleum-based products, including Heating Oil. Rail or barges then transport the Heating Oil from refineries to larger storage facilities, which transport the Heating Oil to smaller storage tanks for sale to customers who typically have their Heating Oil delivered directly to their home or business by truck. Heating Oil and diesel fuel are virtually identical in terms of chemical composition, though Heating Oil is dyed red to denote its tax-free status.

4.      Approximately 5 million households across the United States use Heating Oil, primarily in the Northeast, and to a lesser degree in the South, Midwest, and West, to heat their homes.[2]

5.      Shale oil is the primary input used in the production of Heating Oil, making it the primary determinant of the price of Heating Oil. Accordingly, a conspiracy to fix the price of crude oil is also a conspiracy to fix the price of Heating Oil.

6.      United States independent shale oil producers ("Independents") are companies that primarily focus on the exploration, development, and production of United States shale resources. These companies are distinct from large vertically integrated energy companies, like Chevron and ExxonMobil (known as "supermajor(s)"), with diverse global operations encompassing the exploration, production, refining, and distribution of various energy resources.

7.      Defendants Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer are among the largest Independents focusing on United States shale oil production.

8.      Independents traditionally acted as "swing producers" for the global crude oil market, because of their ability to adjust shale oil production levels rapidly in response to changes in market conditions and push, or "swing," the price of crude oil.

---

[2] *Heating Oil Explained – Use of Heating Oil*, U.S. ENERGY INFO. ADMIN. (last updated Apr. 19, 2023), https://www.eia.gov/energyexplained/heating-oil/use-of-heating-oil.php.

3

9.      Following years of relatively lower prices driven by the United States "Shale Boom" and increasing volumes and efficiencies in producing shale oil, the United States experienced record-high crude oil prices beginning in or around January 2021, continuing through the present.

10.      Basic principles of supply and demand dictate that in their role as swing producers, Defendants should have increased production to capitalize on this price increase. But Defendants decided not to take advantage of this market opportunity. Rather, departing from their historical practice and rational independent self-interest, Defendants decided not to increase their United States shale oil production. As a result, prices of crude oil – and subsequently, the prices of Heating Oil – remained high.

11.      Defendants' agreement to refrain from increasing their shale oil production was part of a larger agreement with the Organization of the Petroleum Exporting Countries ("OPEC")—the international cartel of the largest oil-producing nations, whose stated purpose is to manipulate global oil prices by coordinating production levels amongst its members.[3]

12.      Between at least 2017 and 2023, Defendants met and communicated regularly with each other, and with OPEC, to coordinate their collective oil output in response to market conditions. Following these meetings, Defendants consistently made public statements confirming the discussions and the exchange of confidential information. Specifically, Defendants also confirmed that they discussed with each other and OPEC their production strategies, future investment plans, and price targets. Likewise, when publicly discussing their meetings with Defendants, OPEC officials praised the cooperative nature of their developing relationship with Defendants. One United States shale executive – who asked to remain anonymous – bragged to Reuters about how, after meeting with OPEC and "having an open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production

---

[3] Anshu Siripurapu & Andrew Chatzky, *OPEC in a Changing World*, CFR (Mar. 9, 2022), https://www.cfr.org/backgrounder/opec-changing-world.

and the associated balance of what's going on in our industry," United States shale oil producers "now have a seat at the table on [oil] pricing."[4]

13. OPEC also publicly touted its collaborative relationship with Defendants. Following a panel in which OPEC Secretary General Mohammed Barkindo sat with Defendant Hess Oil's CEO John Hess, Secretary Barkindo wrote in an official OPEC bulletin: "We have to continue to collaborate. It's one industry. It's a global industry, and I think our colleagues in the U.S. are on the same page with us and we will work together to exchange views."[5]

14. While crude oil supply and prices remained relatively stable prior to the COVID-19 pandemic, demand and prices dropped precipitously at the beginning of the pandemic and eventually began climbing again by early 2021. The increase in the price of crude oil following COVID-19 was exacerbated by the Russian invasion of Ukraine in late February 2022, which led to sanctions that largely sequestered Russian oil from the global market. This extended run of historically high crude oil prices provided prime market conditions for agile swing producers like Defendants to aggressively and quickly increase production to capture market share.

15. Instead, Defendants, in a marked departure from their historical practices and directly contrary to each of their individual, unilateral self-interests, limited their United States shale oil production growth. But for the conspiracy alleged herein, no economically rational Independent would have acted or refused to act in this manner.

16. Defendants' agreement to limit their respective shale oil production volumes had the purpose and effect of fixing, stabilizing, and/or maintaining crude oil prices – and, in turn, Heating Oil prices – at artificially inflated levels throughout the United States during the Class Period.

---

[4] Alex Lawler and Ernest Scheyder, *OPEC to meet with U.S. shale firms in Houston on Monday*, REUTERS (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opec-usa-idUSKCN1GB2KP/.

[5] Tom DiChristopher, *Trump blasted OPEC this past year. Hess CEO says the oil producer group deserves praise*, CNBC (Jan. 19, 2023), https://www.cnbc.com/2019/01/23/trump-blasted-opec-hess-ceo-says-the-group-deserves-praise.html.

17.     Defendants' cartel is a *per se* unlawful restraint of trade under federal antitrust law and numerous state antitrust, unfair competition, and consumer protection laws. Plaintiffs and the members of the proposed Classes suffered substantial harm from the supracompetitive prices they paid for Heating Oil as a direct and proximate result of Defendants' agreement to constrain United States shale oil production. They bring this suit to recover those losses and to enjoin Defendants' conduct to prevent Defendants from causing future harm.

## JURISDICTION, VENUE, AND COMMERCE

18.     This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Section 16 of the Clayton Act (15 U.S.C. § 26), as well as the antitrust, unfair competition, and consumer protection laws of various states. This action is for compensatory damages, treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees.

19.     This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

20.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs; there are more than 100 members in the proposed Classes, and Plaintiffs are residents of Connecticut. Thus, at least one Plaintiff is a citizen of a state different from at least one of the Defendants, all of whom are either incorporated in Delaware or Oklahoma and headquartered in Oklahoma, Texas, or New York.

21.     This Court also has personal jurisdiction over all Defendants, and Venue in this District is proper, under the combination of 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d). *See Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1411-12 (9th Cir. 1989). A substantial part of the events or omissions giving rise to the claims occurred in this District. Upon information and belief, each Defendant resides, transacts business, is found, or has an agent in this District.

22.     Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

23.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Defendants, directly and through their agents, engaged in activities affecting all states.

24.     Defendants' conspiracy, and the resulting, substantial anticompetitive effects described herein proximately caused injury to Plaintiffs and members of the proposed Classes.

## **PARTIES**

25.     Plaintiffs Barbara and Phillip MacDowell are citizens of Connecticut and reside in Southington, Connecticut. Plaintiffs purchased Heating Oil during the Class Period and paid higher prices for those purchases as a result of the allegations herein.

26.     Defendant Permian Resources Corporation, known as Centennial Resource Development during the relevant period, is a Delaware Corporation headquartered in Midland, Texas. It was formed in 2022 in a transaction between Colgate Energy Partners III, LLC and Centennial Resource Development, Inc. Centennial's common stock is listed and traded on the New York Stock Exchange under the trading symbol PR. Centennial is an oil and gas production company that acquires and processes shale oil largely in Texas and New Mexico, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

27.     Defendant Chesapeake Energy Corporation is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. Chesapeake's common stock and warrants to purchase common stock trade on the Nasdaq Stock Market under the trading symbols CHK, CHKEW, CHKEZ, and CHKEL. Chesapeake is an oil and gas production company that acquires

and processes shale oil largely in Louisiana and Pennsylvania, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

28.     Defendant Continental Resources Inc. is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. Continental common stock was listed and traded on the New York Stock Exchange under the trading symbol CLR until the purchase of the company by its founder Harold Hamm, on November 22, 2022, through a series of take-private transactions with Omega Acquisition Inc. Continental is an oil and gas company that acquires and processes shale oil largely in North Dakota, Montana, Oklahoma, Texas, and Wyoming, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

29.     Defendant Diamondback Energy, Inc. is a Delaware Corporation headquartered in Midland, Texas. Diamondback's common stock is listed and traded on the NASDAQ Stock Market under the trading symbol FANG. Diamondback is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

30.     Defendant EOG Resources, Inc. is a Delaware Corporation headquartered in Houston, Texas. EOG's common stock is listed and traded on the New York Stock Exchange under the trading symbol EOG. EOG is an oil and gas production company that acquires and processes shale oil in North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

31.     Defendant Hess Corporation is a Delaware Corporation headquartered in New York, New York. Hess's common stock is listed and traded on the New York Stock Exchange under the trading symbol HES. Hess is an oil and gas production company that acquires and processes shale oil in North Dakota, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country. Hess also sells the refined consumer Heating Oil across the United States.

8

32.     Defendant Occidental Petroleum Corporation is a Delaware Corporation headquartered in Houston, Texas. Occidental's common stock and warrants to purchase common stock are listed and traded on the New York Stock Exchange under the trading symbols OXY and OXY WS, respectively. Occidental is an oil and gas production company that acquires and processes shale oil in Colorado, Texas, and New Mexico, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

33.     Defendant Pioneer Natural Resources Company is a Delaware Corporation headquartered in Irving, Texas. Pioneer's common stock is listed and traded on the New York Stock Exchange under the trading symbol PDX. Pioneer is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the United States market where it is refined and disseminated across the country.

34.     The term "Defendants," as used herein, refers to and includes each of the named Defendants – Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer – as well as each Defendant's predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents.

35.     Where Plaintiffs attribute an action to "Defendants," unless otherwise stated, that action is alleged to have been taken by each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer.

## AGENTS AND CO-CONSPIRATORS

36.     Various co-conspirators, some known and some unknown, willingly participated in and acted in furtherance of the alleged conspiracy.

37.     Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

38.     Defendants are liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.

39.     At all relevant times, other known and unknown corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein. The individuals and entities acted in concert through, amongst other things, joint ventures, and by acting as agents for principals in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of shale oil production and crude oil prices.

40.     Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## FACTUAL ALLEGATIONS

**A.      The Organization of the Petroleum Exporting Countries and Its Historical Control Over Crude Oil Prices.**

41.     OPEC is an intergovernmental organization made up of twelve oil-exporting countries – Algeria, Congo, Equatorial Guinea, Gabon, Iran, Iraq, Kuwait, Libya, Nigeria, Saudi Arabia, United Arab Emirates, and Venezuela[6] – who purport to benefit from sovereign immunity to the Sherman Act.[7] OPEC and its member countries control close to 40% of the world's oil production[8] and 80% of its proven current oil reserves.[9]

---

[6] *About Us*, OPEC, https://www.opec.org/opec_web/en/about_us/25.htm.

[7] Mamdouh G. Salameh, *OPEC is an Important Energy Policy Tool to Keep Oil Markets Stable*, IAEE ENERGY FORUM, Vol. 28, ISSN 1944-3188 (Feb. 2019), https://www.iaee.org/documents/2019EnergyForum1qtr.pdf, at 17 (OPEC's stated mission is to "'coordinate and unify the oil policies of its member countries and ensure the stabilization of oil markets . . . .' The organization is also a significant provider of information about the international oil market.").

[8] *What Drives Crude Oil Prices?*, U.S. ENERGY INFO. ADMIN, https://www.eia.gov/finance/markets/crudeoil/supply-opec.php.

[9] *OPEC Shares of Crude Oil Reserves 2022*, OPEC https://www.opec.org/opec_web/en/data_graphs/330.htm.



42.     In the past, OPEC has been able to exert market power over global oil prices by coordinating its members' respective production levels.[10] Non-member nations established their oil production levels based on OPEC guidance to benefit from the oil prices targeted by OPEC, a classic "umbrella pricing" situation.[11]

43.     Historically, Saudi Arabia acted as OPEC's (and thereby the world's) "swing producer," the producer best able to quickly increase production levels in response to changing market conditions.[12] This is because Saudi Arabia has generally had the largest production capacity, and it has maintained the largest margin of excess capacity.[13] Thus, Saudi Arabia has traditionally been the world's de facto price leader to whom not only OPEC members, but also non-OPEC members, look for guidance.

---

[10] Siripurapu & Chatzky, *supra* note 3,

[11] Salameh, *supra* note 7 ("In the 1980s, OPEC began setting production quotas for its member nations; generally, when the quotas are reduced, oil prices increase. . . . Since the 1980s, representatives from Egypt, Mexico, Norway, Oman, and Russia and other oil-exporting nations have attended many OPEC meetings as observers. This arrangement serves as an informal mechanism for coordinating policies.").

[12] *Id.*

[13] *Oil Market Report - January 2024*, INT'L. ENERGY AGENCY, https://www.iea.org/reports/oil-market-report-january-2024#.

44.   By 2014, however, OPEC had lost its ability to exert complete control over global oil prices, thanks to the arrival of a new global oil player, "Cowboyistan," a term used to describe United States shale oil drillers[14] in the industry for their "drill-first, ask-questions-later" business model.[15]

45.   Out of necessity – and despite its long-resisted expansion[16] – in December 2016, OPEC expanded its cartel by signing the first of several agreements with 10 non-member oil-producing nations – Azerbaijan, Kingdom of Bahrain, Brunei Darussalam, Kazakhstan, Malaysia, Mexico, Sultanate of Oman, the Russian Federation, Republic of Sudan, and Republic of South Sudan.[17] The most notable addition to OPEC's membership was Russia, whose production rivaled that of Saudi Arabia. This expansion formed what is now known as "OPEC+."[18]

---

[14] Christopher Helman, *Welcome to Cowboyistan: Fracking King Harold Hamm's Plan for U.S. Domination of Global Oil*, FORBES (Mar. 9, 2015), https://www.forbes.com/sites/christopherhelman/2015/03/09/welcome-to-cowboyistan-fracking-king-harold-hamms-plan-for-u-s-domination-of-global-oil/?sh=bc9df884ed2.

[15] Barney Jopson, *Fracking: The Energy revolution that shook the world*, FIN. TIMES (May 6, 2015), https://www.ft.com/content/6fab1192-f30d-11e4-a979-00144feab7de.

[16] Guy Laron, *The OPEC+ Puzzle: Why Russian-Saudi Cooperation Starts – and Stops – with Oil Prices*, THE WILSON CENTER (Jan. 19, 2023), https://www.wilsoncenter.org/article/opec-puzzle-why-russian-saudi-cooperation-starts-and-stops-oil-prices (Despite decades of tension and bad blood between Russia and Saudi Arabia, "[t]here was no way for OPEC to deal with the growing market power of the US without cooperating with the Russians."); *see also* Harry First & Darren Bush, *The U.S. Can Take on the Oil Cartel that Enables Putin, and Win*, THE N.Y. TIMES (June 3, 2022), https://www.nytimes.com/2022/06/03/opinion/gas-prices-russia-opec.html (Antitrust specialists have concluded that "as more countries joined or allied themselves with the [OPEC] cartel, it has only become more effective at controlling the output of what would otherwise have been competing oil producers.").

[17] *Declaration of Cooperation, OPEC and non-OPEC, 10 December 2016 - 30 November* 2017, OPEC, https://www.opec.org/opec_web/static_files_project/media/downloads/publications/Declaration%20of%20Cooperation.pdf.

[18] Salameh, *supra* note 7 at 18 (In 2017, "Saudi Arabia was forced to eventually discard its [price war with U.S. Independents] strategy and engineer with Russia an OPEC/non-OPEC production cut agreement" in an attempt to regain control of crude oil prices. The agreement was extended through 2018 and converted into a "permanent mechanism for cooperation between OPEC and Russia in what has been dubbed as OPEC+."). Throughout this Complaint, references to OPEC from December 2016 onwards encompass OPEC+.

**B.      Fracking and a "New Oil Order."**

46.     While the presence of hydrocarbons in shale formations was known for quite some time, it was not until the early 2000's when technological innovations in horizontal drilling and fracking made it economically viable to substantially increase output from shale and other tight rock formations.[19]

47.     The introduction of fracking changed everything in the oil industry. Between 2008 and 2015 – within eight years of the first commercial shale operation coming online in Texas in 2002 – United States shale producers were pumping enough shale oil to reverse a 35-consecutive-year trend of declining United States crude oil production. This period in which the United States experienced its fastest increase in crude oil production capacity in history became known as the "Shale Revolution."[20]

48.     United States shale oil production posed a unique problem for OPEC. Unlike the supermajors, who typically invest in decades-long traditional drilling projects that require substantial lead time and infrastructure construction before production begins, United States shale oil wells: (a) require smaller capital commitments; (b) can be drilled in two to four weeks;[21] (c) can be brought online within months; and (d) allow for production to be comparatively front-loaded. Consequently, production of crude oil from shale wells is more responsive to changing prices and real-time market conditions than traditional drilling methods used by supermajors. According to market analysts, "the shale sector's ability to boost production – and to scale back –

---

[19] John Kemp, *Is the U.S. shale oil revolution over?*, REUTERS (Nov. 23, 2022), https://www.reuters.com/markets/commodities/is-us-shale-oil-revolution-over-kemp-2022-11-22/.

[20] Robert Rapier, *How The Shale Boom Turned the World Upside Down*, FORBES (Apr. 21, 2017), https://www.forbes.com/sites/rrapier/2017/04/21/how-the-shale-boom-turned-the-world-upside-down/?sh=497a463b77d2.

[21] Ryan Moore, *The Numbers: The Permian Excels*, PHEASANT ENERGY (last updated Sept. 7, 2023), https://www.pheasantenergy.com/the-numbers-the-permian-excels (Defendant Pioneer, the largest acreage holder in the Midland Basin of the Permian, reported that as of 2018, it took it approximately 15 to 20 days to drill a well down 10,000 feet and horizontal out to 20,000 feet.).

Case 1:24-cv-00852-MLG-LF   Document 1   Filed 02/15/24   Page 14 of 80

relatively quickly is its calling card,"[22] which makes United States shale oil, "as close to inventory-on-demand as oil ever comes."[23]

49.     But unlike OPEC (who purports to benefit from sovereign immunity to the Sherman Act), Independents are subject to the Sherman Act. This means that while United States shale would come to produce as much oil as the largest OPEC and OPEC+ nations,[24] they did not have the ability to coordinate production levels and prices like the OPEC cartel. Rather, as a boon to Heating Oil consumers like Plaintiffs and members of the proposed Classes, Independents were forced to compete with one another, resulting in lower prices not only for crude oil, but also for derivative petroleum products such as Heating Oil.

50.     A "new oil order" had emerged.[25] The aggressive competition of United States shale producers usurped the Saudi swing producer role,[26] and saw United States domestic production erode OPEC-set cartel price premiums.

**C.     The 2014-2016 "OPEC Price War."**

51.     As sovereign nation-states with GDPs (and, in some cases, currencies) that rely heavily on crude oil prices, OPEC and its member nations were not about to willingly cede the

---

[22] Liam Denning, *Shale Companies Say They Can't Drill More. Even When There's a War?*, BLOOMBERG (Feb. 28, 2022), https://www.bloomberg.com/opinion/articles/2022-02-28/shale-companies-say-they-can-t-drill-more-even-when-there-s-a-war.

[23] Steve LeVine, *Oil Hasn't Bottomed out, so Trade Now at Your Own Peril*, QUARTZ (Feb. 10, 2015), https://qz.com/341884/oil-hasnt-bottomed-out-so-trade-now-at-your-own-peril.

[24] Devin Krishna Kumar, U.S. expected to end 2018 as world's top oil producer: EIA, REUTERS (Dec. 11, 2018), https://www.reuters.com/article/us-usa-oil-eia-outlook/u-s-expectedto-end-2018-as-worlds-top-oil-producer-eia-idUSKBN1OA21D.

[25] Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

[26] Hailey Lee, *Why OPEC's Losing Its Ability to Set Oil Prices*, CNBC (Oct. 27, 2014), https://www.cnbc.com/2014/10/27/us-shale-replaces-opec-as-leading-swing-producer-goldman.html (The United States has nearly four times the spare capacity in shale oil compared to Saudi Arabia); David Livingston & Eugene Tan, *Shale's True Contribution to the Oil Market*, CARNEGIE ENDOWMENT FOR INT'L PEACE (July 9, 2015), https://carnegieendowment.org/2015/07/09/shale-s-true-contribution-to-oil-market-pub-60659

14

pricing power OPEC had held over global oil prices for a half-century to United States shale producers. Instead, OPEC decided to leverage its control over the cheapest-to-produce oil in the world to drive the more expensively produced United States shale oil out of the market.

52.     OPEC determined that Cowboyistan had to go. Accordingly, in mid-2014, despite a global oversupply of crude oil, OPEC made a deliberate long-term choice to maintain, rather than reduce, its production levels to win back the market share it had lost to Independents and to push oil prices to a level that would render United States shale oil no longer economically viable.[27] This two-year period of open global competition, dubbed within the industry as the "OPEC Price War," had begun.

53.     Over the next two years, as shown in Figure 1, the price of crude oil would plummet, as both OPEC member nations and United States shale oil producers flooded the market with crude oil at production levels not seen in decades.

**Figure 1. Daily Crude Oil Spot Prices (2010-2016)**



---

[27] Siripurapu & Chatzky, *supra* note 3; Javier Blas, *Wall Street is Finally Going to Make Money Off the Permian*, BLOOMBERG (Apr. 24, 2023), https://www.bloomberg.com/opinion/articles/2023-04-24/higher-oil-prices-means-wall-street-s-shale-investments-will-finally-pay-off (In February 2016, Saudi Arabia's Oil Minister Al-Naimi cautioned U.S. shale producers to "[l]ower costs, borrow cash, or liquidate.").

54.     Likewise, as demonstrated in Figure 2, during the same period, prices for Heating Oil also plummeted.

**Figure 2. No. 2 Heating Oil[28] Prices (2010 – 2016)**



55.     The OPEC Price War dragged on for years for two reasons. First, shale oil production was a brand-new industry where technological advancements and accumulating experience was driving breakeven points lower,[29] allowing Independents to exploit less productive

---

[28] No. 2 heating oil is the most common home heating oil and is virtually identical to diesel in chemical composition.

[29] In the beginning of 2014, "Rystad Energy estimated the average breakeven price for tight oil to be $82 per barrel," but by 2018, the average breakeven price had dropped to $47 per barrel, and by 2021, $37 per barrel. *See Rystad Energy: As falling Costs Make New Oil Cheaper to Produce, Climate Policies May Fail Unless they Target Demand*, ROGTEC MAGAZINE (Nov. 17, 2021), https://www.rogtecmagazine.com/rystad-energy-as-falling-costs-make-new-oil-cheaper-to-produce-climate-policies-may-fail-unless-they-target-demand; Maitham A. Rodhan, *The Effect of US Shale Oil Production on Local and International Oil Markets*, 13 INT'L J. OF ENERGY ECONS. & POLICY 4 (July 2023), https://econjournals.com/index.php/ijeep/article/view/14455 ("This continuous decrease in the break-even price of shale oil made the US shale oil industry more flexible to face fluctuations in oil prices" and "[d]espite the drop in prices from about $100 a barrel in 2014 to $64 a barrel in 2019, shale oil production has doubled by 100% during this period.").

16

shale plays profitably.[30] Second, the United States legal structure (including corporate and bankruptcy law) encourages business formation and risk-taking, making business failure less economically devastating to the individuals involved.

56.   United States shale oil producers continued to drill at consistent levels despite the price drop caused by the OPEC Price War. By implementing cost-cutting measures and focusing on the most productive shale oil plays, Defendants found ways to remain competitive in the lower-price environment.[31] Knowing that OPEC member nations, whose economies relied heavily on oil revenues, were similarly hurting, United States shale oil producers simply waited, ready to pounce whenever prices improved. As Defendant Pioneer's CEO promised, United States shale oil producers were poised and ready to respond by ramping up production whenever oil prices moved above $60/barrel.[32]

57.   Although the OPEC Price War consolidated the United States shale industry, causing dozens of smaller Independents to fail,[33] it allowed larger Independents, like Defendants, to rally together in the face of a shared adversary, i.e. OPEC.

---

[30] A shale oil "play" denotes a geographic area with economically extractable oil from shale formations.

[31] Steven Mufson, *Is the Oil World Big Enough for Two Swing Producers?*, THE WASH. POST (Sept. 29, 2016), https://www.washingtonpost.com/business/economy/is-the-oil-world-big-enough-for-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3ef-f35afb41797f_story.html (noting that "the companies in [the U.S. shale industry] are ready to add production every time the price starts creeping up" and attributing to Defendant Pioneer CEO Scott Sheffield a promise that if oil prices moved above $60 a barrel, the U.S. Shale industry would respond by ramping up production).

[32] *Id.*

[33] Matt Egan, *OPEC tried to put this US shale oil driller out of business. It 'backfired'*, CNN BUSINESS (May 12, 2017), https://money.cnn.com/2017/05/12/investing/shale-oil-ceo-opec/index.html.

1

**D.     Coordination Between OPEC and Cowboyistan Gives Defendants a "Seat at the Table on Pricing."**

2

58.     Weary after years of low prices and unsuccessful attempts to price United States

3

shale oil producers out of the market,[34] OPEC changed tactics.

4

59.     First, as noted above, in December 2016, OPEC expanded by adding 10 non-

5

OPEC oil producing nations to form OPEC+. This reduced the number of OPEC's competitors

6

and increased OPEC's global market share.

7

60.     Second, having brought one enormous potential competitor (Russia) into the fold

8

and unable to beat Independents in the free market, OPEC started a years-long campaign to bring

9

"Cowboyistan" into the cartel.

10

61.     United States shale oil producers were also weary of the OPEC Price War and

11

were therefore open to the idea of joining the cartel. As reported by MarketWatch on September

12

8, 2016, "Shale-oil baron [and Defendant Continental CEO] Harold Hamm thinks major crude-

13

oil producers need to settle on a plan to stabilize oil prices sooner than later."[35] Hamm, "calling

14

for a freeze of production . . . said it is 'high time' for Russia and the Organization of the

15

Petroleum Exporting Countries [OPEC] to forge a pact that would put an end to [the] slide in

16

crude oil prices."[36]

17

62.     Hamm and Defendants had gained leverage and the respect of OPEC during the

18

OPEC Price War. Now, Hamm was clearly signaling to OPEC that Continental and the other

19

Defendants were willing to play ball.

20

21

22

23

[34] Mufson, *supra* note 31 (as a result of the ongoing price war, OPEC "regained some market share and put a floor under prices. But its success has been slow, limited and remains fragile. And the price [$45-$55 a barrel at that time] is still half of where they'd like it to be.").

24

25

[35] Mark DeCambre, *Harold Hamm Says It Is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH (Sept. 8, 2016), https://www.marketwatch.com/story/trumps-potential-energy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08.

26

27

[36] *Id.*

63.     At least as early as 2017, Defendants and members of OPEC began meeting and sharing dinners together, including at industry events.[37] Many of these meetings took place during the CERAWeek Conference, an energy-focused event, held annually in Houston, Texas.[38]

64.     During the March 6-10, 2017 CERAWeek Conference ("CERAWeek 2017"), former Nigerian politician and OPEC's then-General Secretary Mohammed Barkindo "dined with about two dozen U.S. shale executives," including Pioneer's Scott Sheffield, Hess's John Hess, and Chesapeake's Robert Douglas Lawler.[39] OPEC had purportedly never before met with United States shale producers,[40] leading reporters to describe the meeting as "unusual."[41]

65.     Meetings during CERAWeek 2017 "opened a communication channel between the shale companies and OPEC countries."[42] Pioneer's Scott Sheffield told Bloomberg, "I'm seeing a series of meetings where OPEC is reaching out and spending more time with US [I]ndependents than I have seen over my entire career."[43] Sheffield further admitted to attending what was described as a "Dinner Détente" and while he couldn't discuss what was said over that

---

[37] Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in no Rush to Resume Price War*, REUTERS (Mar. 10, 2022), https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-us-shale-opec-no-rush-resume-price-war-2022-03-10 (OPEC began hosting regular dinners and events in 2017 "to better understand private sources of financing that allowed new companies to emerge" and "[o]ver time, the dinners grew more collegial.").

[38] Dan Yergin and James Rosenfield founded Cambridge Energy Research Associates (CERA) (see https://ceraweek.com/about/index.html), which became known for its annual conference in Houston, Texas, focusing on the energy sector's future. Over time, this event grew into CERAWeek, a five-day event offering speaking sessions and networking opportunities for attendees.

[39] Javier Blas & Grant Smith, *OPEC Head to Meet with U.S. Shale Producers for Dinner Next Week*, BLOOMBERG (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] David Wethe, *Oil to Hit $40 if OPEC Fails to Expand Cuts, Pioneer Says*, BLOOMBERG, (Mar. 7, 2017). https://www.bloomberg.com/news/articles/2017-03-07/pioneer-s-sheffield-sees-40-oil-if-opec-doesn-t-extend-cuts?embedded-checkout=true#xj4y7vzkg.

dinner, he did say that "[OPEC's] trying to understand our business model" and "I think they're trying to understand more about our ability to produce, what the cost structure is and what's going to happen over the next several years."[44] Sheffield added that, "[i]n return, shale producers are talking with OPEC to learn about the members' thought process towards the price of oil over the next several years, what supplies the different members have themselves, and whether inventories are falling."[45] According to Sheffield, "[this] helps us plan long term."[46]

66.     Indeed, CERAWeek 2017 served as a channel for OPEC's Secretary General to "garner views and opinions from other senior oil industry executives" in "bi-lateral" meetings with shale executives, according to Defendant Hess's CEO, John Hess.[47] Following a dinner with OPEC officials, Hess reported to Bloomberg, "It was a very good exchange of information and views about oil . . . I really commend the OPEC Secretary General for outreach. It was a good talk."[48] OPEC Secretary General Barkindo confirmed that everyone was on the same page regarding the need to collectively work to achieve price stability following the 2017 meetings, because "no-one wants to see a repeat of 2015 and 2016."[49]

67.     Also during CERAWeek 2017, OPEC and United States shale producers "agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone . . . [but] shale producers signaled they weren't ready to give up on the growth they see ahead," or at least not yet.[50]

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *CERAWeek 2017: Encouragement & engagement*, 47 OPEC BULLETIN 2, (Mar./Apr. 2017),       https://docplayer.net/55519391-Vienna-austria-save-the-date-june-hofburg-palace-vienna-austria.html, at 16.

[48] Javier Blas, *OPEC Said to Break Bread with Shale in Rare Show of Détente*, BLOOMBERG (Mar. 7, 2017),    https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shale-in-rare-show-of-detente.

[49] OPEC BULLETIN, *supra* note 47, at 15.

[50] Blas, *supra* note 48.

68.     As the participants of this meeting readily acknowledged, United States shale oil producers – including some, if not all, of the Defendants – not only shared competitively sensitive, forward-looking information concerning both production levels and pricing with OPEC, but they expressly agreed to reduce crude oil supplies.

69.     Shortly after the CERAWeek 2017 meetings, Saudi Arabia's Energy Minister Khalid Al-Falih warned United States shale producers that if they wanted to collaborate, there would be no "free rides" on OPEC production cuts, and they must be ready to pull their weight when the time comes.[51] Put another way, OPEC told United States shale producers that OPEC expected Independents to work together and coordinate their production cuts alongside OPEC.

70.     Later that year, OPEC Secretary General Barkindo told reporters that Defendants were "beginning to ask questions about how to proceed [alongside OPEC] in a more responsible manner."[52] Barkindo explained that he understood, from a meeting with executives of Defendants Hess and Continental during CERAWeek 2017, that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."[53]

71.     In discussing plans to meet with United States shale executives for the second year in a row during another scheduled dinner at the 2018 CERAWeek Conference ("CERAWeek 2018"), OPEC Secretary General Barkindo explained, "[i]t's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek."[54] Barkindo further said that OPEC and the United States shale industry agreed at their first meeting in 2017, that they had a "shared responsibility" towards the oil markets,[55] and the CERAWeek

---

[51] Ron Bousso, *Exclusive - Saudis Tell U.S. Oil: OPEC Won't Extend Cuts to Offset Shale - Sources*, REUTERS (Mar. 9, 2017), https://www.reuters.com/article/idUSKBN16G2TQ/.

[52] Anjli Raval, *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing*, FIN. TIMES (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.

[53] *Id.*

[54] Blas & Smith, *supra* note 39.

[55] *Id.*

2018 dinner was organized to "further explore the mechanic of achieving our common objective" of stable production volumes and prices.[56]

72.     That dinner was held on March 5, 2018, at Houston's "The Grove" restaurant.[57] During the dinner, OPEC officials met with United States shale executives, and Secretary General Barkindo gave a speech that Defendant Pioneer's then-CEO Tim Dove summarized to a reporter as an exchange of OPEC's forward-looking views on the oil market: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth."[58] Defendant Centennial's CEO Mark Papa described the speech as "a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together."[59]

73.     OPEC representatives, including Gabriel Mbaga Obiang Lima, Equatorial Guinea's petroleum minister, similarly described the meeting between OPEC and United States shale executives as much more than generalizations, with the key takeaway being a shared commitment to exchange confidential production information: "The key thing is that information is shared about our projections; it really helps everybody . . . the important thing is to know how much they [U.S. shale] are investing and their projections because usually they have good statistics."[60] Lima explained that, by sharing this information, "[w]hat we are doing is avoiding volatility," or put another way – coordinating production decisions to impact the price of crude oil rather than allowing market forces to dictate outcomes.[61]

---

[56] *Id.*

[57] Ernest Scheyder & Ron Bousso, *U.S. shale and OPEC share steak in uneasy truce at Houston dinner*, REUTERS (Mar. 7, 2018), https://www.reuters.com/article/us-ceraweek-energy-opec-shale-idUSKCN1GJ04H/.

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

74.     Nigerian Oil Minister and OPEC representative Emmanuel Ibe Kachikwu agreed that it was time for United States shale producers to "take some responsibilities in terms of stability of oil prices."[62] Indeed, Secretary General Barkindo confirmed that OPEC and the United States shale executives "had a very open, frank and lively conversations [sic] on the current state of the cycle and we also compared notes from our experiences during these cycles, how we should proceed going forward. I was very surprised by the high-level of turnout, as well as the interest they [U.S. shale executives] have shown in continuing this energy dialogue."[63] Barkindo explained that OPEC and Defendants "compared notes on our experiences in this cycle [*i.e.*, the recent price war] which everyone agreed was the most injurious."[64]

75.     As one shale executive, who insisted on remaining anonymous, described to Reuters, Cowboyistan had parlayed their successful price-war resistance into a seat at OPEC's "table on pricing."[65]

76.     With their newly acquired "seat at the table," Defendant Continental's CEO Harold Hamm "appeared . . . to be trying to reach a more conciliatory tone with OPEC producers" and, in May 2018, Hamm "attended a board meeting of Saudi Aramco, the oil producer controlled by OPEC's largest member, Saudi Arabia."[66]

---

[62] Ernest Scheyder, *Nigeria Prime Minister says majors in shale, OPEC should keep crude price stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweek-energy-nigeria/nigeria-minister-says-majors-in-shale-opec-should-keep-crude-price-stable-idINKBN1GH347/.

[63] *OPEC bulletin Special Edition: OPEC international energy dialogues*, OPEC (May 9, 2018), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf, at 51.

[64] Patti Domm, *OPEC Wants to Take Its Relationship with US Shale Producers to the Next Level*, CNBC (Mar. 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-its-relationship-with-us-shale-producers-to-the-next-level.html.

[65] Lawler & Scheyder, *supra* note 4.

[66] Ernest Scheyder, *Continental Resources CEO Harold Hamm pulls out of OPEC meeting*, REUTERS via YAHOO! NEWS (June 18, 2018), https://www.yahoo.com/news/continental-resources-ceo-harold-hamm-162200046.html.

23

77.     Following the CERAWeek 2018 dinner, Secretary General Barkindo invited United States shale officials to join him at an OPEC International Seminar in Vienna, Austria in June 2018 ("June 2018 OPEC Seminar").[67] At least two of the Defendants' executives, Scott Sheffield (Pioneer) and John Hess (Hess), attended the June 2018 OPEC Seminar, during which Sheffield stated, "[t]hey [OPEC] need to put together some kind of deal to phase into the market. None of us want $80 to $100 [per barrel] oil, that's too high. There's a sweet spot between $60 and $80."[68] Sheffield urged, "OPEC needs to fulfill its duty."[69]

78.     Critically, the June 2018 OPEC Seminar was perhaps the first time Defendants admitted publicly to doing more than merely listening to OPEC during its meetings. Sheffield admitted speaking to the OPEC panel about Defendants' and OPEC's crude oil supplies and their effects on global oil prices: "My message yesterday as I spoke to the panel was that it's important that OPEC increases production somewhat to make up for the difference. . . . If they don't we are going to see $100 oil or higher."[70]

79.     Sheffield was heard loud and clear, and he received a return message. Two days before OPEC's June 22, 2018 production negotiation, Sheffield predicted to Bloomberg the exact amount of OPEC's production change.[71]

---

[67] Domm, *supra* note 64.

[68] Ernest Scheyder, *U.S. Shale Executive Pushes OPEC to Gradually Boost Output*, REUTERS (June 20, 2018), https://www.reuters.com/article/idUSKBN1JG2OA/.

[69] *Id.*

[70] *Pioneer Chairman Sees an OPEC Increase of up to 600,000 B/D*, BLOOMBERG (June 21, 2018), https://www.bloomberg.com/news/videos/2018-06-21/pioneer-chairman-sees-an-opec-increase-of-up-to-600-000-b-d-video.

[71] Compare *id.* (Sheffield: "The soft number will be around 5-600,000 [bpd], they might announce 1 million . . . and that will phase in over the next few months.") with Rania El Gamal, et al., OPEC agrees modest hike in oil supply after Saudi and Iran compromise, REUTERS (June 22, 2018), https://www.reuters.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil-supply-after-saudi-and-iran-compromise-idUSKBN1JI0OG/ ("Saudi Arabia said the move [increase in production] would translate into a nominal output rise of around 1 million barrels per day (bpd), or 1 percent of global supply. Iraq said the real increase would be around 770,000 bpd[.]").

80.     In January 2019, OPEC's Secretary General sat on a panel with John Hess, CEO of Defendant Hess; Vicki Hollub, CEO of Defendant Occidental; and Dan Yergin, Vice Chairman of IHS Markit; at the Davos World Economic Forum in Davos, Switzerland.[72] According to Reuters, Hess and Hollub both "said that [the] growth of U.S. shale oil output would slow" in the near future.[73]

81.     During the Davos Forum, OPEC's Secretary General Barkindo, in turn, expressed a desire "to talk more regularly to U.S. producers to understand their industry better even if they could not participate in any OPEC-led production cuts."[74] Barkindo also addressed the current oil market dynamics, highlighting the importance of OPEC+ in helping stabilize the oil market over the past two years following the OPEC Price War.[75] Additionally, Barkindo underscored that market uncertainties and volatility are detrimental to industry investments, and that continuing joint and collaborative efforts among producers were crucial to ensure timely investments.[76]

82.     Hess praised these comments and said that "the Secretary General of OPEC, as well as OPEC Members, play a very important role in stabilizing markets for oil, so those efforts are to be recognized."[77] Barkindo responded: "We have to continue to collaborate. It is one industry. It is a global industry, and I think our colleagues in the US are on the same page with us and we will work together to exchange views."[78]

---

[72] IHS performs market analyses on behalf of OPEC member nations.

[73] Dmitry Zhdannikov, *U.S. Oil Firms Tell OPEC Their Growth Will Slow*, REUTERS (Jan. 23, 2019), https://www.reuters.com/article/idUSKCN1PH1UX/.

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] DiChristopher, *supra* note 5.

[78] *Id.*

83.     During that same month, OPEC+ began new production cuts, agreeing to reduce supply by 1.2 million bpd over the next six months.[79] After the cuts were announced, Reuters reported that "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude prices higher [when announced] closing at levels that [shale] oil executives said would keep their profits flowing."[80]

84.     For the third consecutive year, United States shale executives met with OPEC members during the 2019 CERAWeek held from March 11-14, 2019 ("CERAWeek 2019"). Bloomberg reported that "[t]he event has become an informal communication channel between the cartel and fast-growing shale producers."[81]

85.     Discussing his anticipated meeting with United States shale executives during CERAWeek 2019, OPEC's Secretary General Barkindo shared, "[w]e initiated a valuable dialogue with the U.S. shale producers two years ago in the midst of the last cycle and we agreed to continue the dialogue because we broke barriers . . . . It is essential we continue the conversation with [the] U.S. shale industry."[82] Barkindo reported that a Monday night dinner attended by Defendant CEOs John Hess (Hess), Vicki Hollub (Occidental), Mark Papa (Centennial), and Travis Stice (Diamondback),[66] included a "friendly conversation on current industry issues and the immediate prospects and challenges for all."[83] Barkindo also indicated that

---

[79] Alex Lawler, *OPEC posts first 2019 oil-output rise despite Saudi cuts*, REUTERS (Aug. 30, 2019), https://www.reuters.com/article/us-oil-opec-survey-idUSKCN1VK1YD.

[80] Jennifer Hiller, *U.S. shale producers see OPEC pullback helping 2019 profits*, REUTERS (Dec. 8, 2018), https://www.reuters.com/article/idUSL1N1YC20I.

[81] Javier Blas and Kevin Crowley, *OPEC to Break Bread With Shale Competitors for Third Year*, BLOOMBERG (Mar. 11, 2019), https://www.bnnbloomberg.ca/opec-to-break-bread-withshale-competitors-for-third-year-1.1227226.

[82] *Id.*

[83] Javier Blas & Rachel Adams-Heard, *OPEC Splits Avocado Appetizer with Shale Adversaries in Texas*, BLOOMBERG (Mar. 11, 2019), https://www.bloomberg.com/news/articles/2019-03-11/opec-to-break-bread-with-shale-rivals-in-houston-for-3rd-year.

OPEC and its allies will continue supply adjustments through 2019.[84]

86.     Diamondback CEO Stice spoke with reporters directly after what he called "a very good session" between OPEC and Defendants, noting that the meeting featured "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."[85]

**E.     Defendants Agree to Cut Production.**

87.     With increased communications and information exchanges, it is unclear when exactly Defendants began coordinating their output in conjunction with OPEC. At least through the end of 2018, it appeared to the outside world that Defendants were not yet ready to slow their growth and cut back production, as shown in Figure 3.

---

[84] *OPEC Secretary General on Saudi Arabia's oil production, Venezuela and NOPEC*, CNBC (Mar. 12, 2019), https://www.cnbc.com/video/2019/03/12/opec-secretary-general-on-saudi-arabias-oil-production-venezuela.html.

[85] Blas & Adams-Heard, *supra* note 83.

27

**Figure 3. Change in Crude-Oil Production − United States Shale Oil v. OPEC (2014 − 2019)**[86]



88.     Indeed, analysts predicted that 2019 would be the start of "[t]he second wave of the U.S. Shale revolution," which should have been "concerning for OPEC" because "U.S. oil output is expected to grow by 1.4 million barrels a day this year, to average 12.4 million barrels a day."[87]

89.     However, this second wave never occurred. In 2020, lockdowns associated with the COVID-19 pandemic drove demand for crude oil lower than ever, sending multiple shocks

---

[86] Sarah McFarlane & Pat Minczeski, *OPEC vs. Shale: The Battle for Oil Price Supremacy*, THE WALL STREET JOURNAL (Apr. 18, 2019), https://www.wsj.com/articles/opec-vs-shale-the-battle-for-oil-price-supremacy-11555588826.

[87] *Id.*

28

throughout the world oil markets. Worldwide oil production fell,[88] the United States shale oil industry consolidated, and smaller Independents went bankrupt.[89]

90.     During this economic turmoil, Defendants and OPEC signaled to each other their willingness to end the price war and collaborate on their respective production levels, and consequently, global crude oil prices. In July 2020, OPEC's Secretary General made it clear that OPEC could inflate and sustain high crude prices if Defendants played ball: "We were able to reach out to the U.S. [I]ndependents and we had established a line of communication with them. We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers. There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. . . . Everybody has a role to play. . . . We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry."[90]

91.     On November 28, 2020, Defendant EOG's CEO Bill Thomas confirmed Defendants' willingness, as a group, to follow OPEC's lead on pricing and not to respond by increasing production: "In the future, certainly we believe OPEC will be the swing producer – really, totally in control of oil prices. . . . We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices."[91]

---

[88] Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html.

[89] Irina Slav, *Shale Executives See Little Chance of Significant Growth*, OILPRICE.COM via BUSINESS INSIDER (Dec. 6, 2020), https://markets.businessinsider.com/news/stocks/shale-executives-see-little-chance-of-significant-growth-1029867633.

[90] *OPEC Secretary General: No objective to drive US shale out of business*, OIL & GAS JOURNAL (July 9, 2020), https://www.ogj.com/general-interest/article/14179258/opec-secretarygeneral-no-objective-to-drive-us-shale-out-of-business.

[91] Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in OPEC Hands*, BLOOMBERG (Nov. 28, 2020), https://www.bloomberg.com/news/articles/2020-11-28/the-pandemic-has-broken-shale-and-left-oil-markets-in-opec-hands..

29

92.     When the world emerged from the pandemic lockdowns in early 2021, demand for crude oil surged, and with it, so did crude oil prices, reaching nearly $70 a barrel in March 2021.[92] OPEC and OPEC+ countries collectively withheld production to push up prices further.[93]

93.     Defendants also responded to rising prices by withholding production as they promised, suddenly (and in near-unison) preaching supply "discipline" for the first time in the history of United States shale. Over the course of 2021, Defendants would continue to signal to each other, OPEC, and the market that they were no longer competing for market share or willing to act as swing producers:

- In a February 2021 interview, Defendant Chesapeake's CEO Doug Lawler announced that United States shale producers were entering a "new era" of shale production that "requires a different mindset" of "more discipline and responsibility."[94] Defendant Pioneer's CEO Scott Sheffield agreed, predicting that small companies would increase output but in the aggregate United States output would remain flat, even if crude prices go above $60, as the large United States Independents would jointly practice discipline.[95]

- In March 2021, on the same day OPEC announced supply restrictions, Defendant Occidental's CEO Vicki Hollub said that despite a "healthier supply and demand environment" and "a V-shaped" post-pandemic recovery, United States oil production would not return to pre-pandemic

---

[92] Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html.

[93] *Id.*

[94] Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/

[95] *Id.*

heights, because Defendants and other United States shale producers were "committed to value growth, rather than production growth."[96]

- In April 2021, Defendant Pioneer's CEO Sheffield signaled that Pioneer and other United States shale producers would not meet rising prices by increasing supply.[97] Sheffield also expressed that United States shale producers risked another price war with OPEC and its allies if they resumed the rapid production growth of the last decade, and he balked at the federal government's forecasts that predicted an increase in United States oil production, instead declaring that he was "totally against" any production increase as "producers now know the stakes and will stick to their mantra of capital discipline."[98]

- In a June 2021 interview with Reuters, Sheffield said he was "confident the producers will not respond" to the high crude oil prices by increasing production, because they were focused on "shareholder returns."[99] According to Reuters, "[i]n the United States, closely held companies have contributed substantially to rig additions this year, but Sheffield said those smaller firms should not drive up volumes enough to ruffle OPEC+ producers."[100]

---

[96] Pippa Stevens, *U.S. Oil Production Won't Return to Pre-Pandemic Levels, Says Occidental CEO*, CNBC (Mar. 4, 2021), https://www.cnbc.com/2021/03/04/us-oil-production-wont-return-to-pre-pandemic-levels-occidental-ceo.html.

[97] Kevin Crowley, *Shale CEO Warns of OPEC+ Price War if U.S. Oil Production Surges*, BLOOMBERG (Apr. 14, 2021), https://www.bloomberg.com/news/articles/2021-04-14/shale-ceo-warns-of-opec-price-war-if-u-s-oil-production-surges.

[98] Kevin Crowley, *Pioneer Chief Warns of OPEC+ Price War Risk*, RIGZONE (Apr. 14. 2021), https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/.

[99] Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28.

[100] *Id.*

- On an August 5, 2021 earnings call, Defendant EOG's President and CEO Bill Thomas, echoing Lawler's February 2021 language, referenced a "new era" of collaboration in the global crude oil market with a "more positive macro environment than we've been in since really the shale business started. I think OPEC+ is solid. I think the U.S. will remain disciplined. And so, I think the industry is in for a long run of really good results."[101]

- On October 3, 2021, Defendant Pioneer's CEO Sheffield declared that United States producers were not willing to increase supply to curb soaring crude oil prices that were "under OPEC control,"[102] reflecting Defendants' production restraint agreement. Sheffield reaffirmed Pioneer's commitment to the agreement, promising to cap any Pioneer output increase at 5% per year no matter the price of crude oil, explaining "everybody's going to be disciplined, regardless whether it's $75 Brent,[103] $80 Brent, or $100 Brent . . . ."[104]

94.   Given that Defendants' breakeven prices at the time were around $40/barrel,[105] Defendants' discipline and restraint came as a surprise to oil industry analysts:

---

[101] EOG Resources (EOG), *Q2 2021 Earnings Call Tr.,* THE MOTLEY FOOL (Aug. 5, 2021), https://www.fool.com/earnings/call-transcripts/2021/08/05/eog-resources-eog-q2-2021-earnings-call-transcript/.

[102] Derek Brower & David Sheppard, *US Shale Drillers Cannot Contain Oil Price Rise, Pioneer Boss Says*, FIN. TIMES (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45ce-a13a-7d8419426b05.

[103] "Brent," also referred to as Brent crude or Brent blend, is a widely recognized benchmark for pricing crude oil internationally and the most traded of all of the oil benchmarks. https://www.ig.com/us/glossary-trading-terms/brent-crude-definition. Brent oil is "sweet and light, making it easy to refine into diesel fuel and gasoline." *Id.* Approximately 80% of global crude oil uses "Brent" as the price barometer. https://www.ice.com/brent-crude. The price of Brent crude oil is determined through trading on the Intercontinental Exchange ("ICE") in London. It is often used as a reference point for setting oil prices.

[104] Brower & Sheppard, *supra* note 102.

[105] EOG Resources, *Value Matters: 4Q 2021 Presentation*, (2022), https://s24.q4cdn.com/589393778/files/doc_financials/2021/q4/EOG_0222.pdf   (Defendant

32

- In January 2021, Reuters reported that "U.S. shale producers are keeping their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles."[106] The reporter noted that the recent "run up in crude prices, and oil output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom."[107]

- In June 2021, another Reuters columnist noted that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel."[108] 2021's "run up in crude prices, and oil output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom."[109] However, the author observed that Defendants' output restraints had "emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices. . . . Shale producers have publicly reiterated their new commitment to output restraint in interviews as well as calls with analysts and investors."[110] The author further noted that "there is a broad consensus among OPEC+ countries and the U.S. shale

---

EOG's price needed to secure 10% return on capital, not breakeven, was approximately $40.); Occidental Petroleum Corp., *Q3 2020 Earnings Call Tr.*, OXY.COM (Nov. 10, 2020), https://www.oxy.com/globalassets/documents/investors/quarterly-earnings/OXY3Q20Transcript.pdf (Defendant Occidental's breakeven price was approximately $40.); Diamondback Energy, Investor Presentation (Nov. 2021), at Slide 11, https://www.diamondbackenergy.com/static-files/532c60b3-f8f0-4f43-8368-91b9f4b628e2 (Defendant Diamondback Energy's 2021 breakeven price was "approximately $32 per barrel.")

[106] Hampton, *supra note* 99.

[107] *Id.*

[108] John Kemp, *U.S. Shale Restraint Pushes Oil Prices to Multi-Year High*, REUTERS (June 4, 2021), https://www.reuters.com/article/global-oil-kemp-idAFL5N2NM37M.

[109] Hampton, *supra note* 99.

[110] Kemp, *supra note* 108.

33

industry on the need for slower output growth, higher prices, and wider profit margins."[111]

- On Defendant Chesapeake's Q4 2021 earnings call, Bank of America Managing Director and Head of U.S. Oil and Gas was confounded by Chesapeake's new strategy, telling Chesapeake's CEO that the company's plans to slow production would be "the easiest way to destroy value" for the company in the long term.[112]

95.     OPEC, however, knew what was happening. In early 2021, OPEC estimated that United States shale production would see a significant annual drop. Reuters reported that anonymous OPEC sources confirmed, "[t]he lack of a shale rebound could make it easier for OPEC and its allies to manage the market."[113] OPEC's Secretary General Barkindo signaled that the Price War was over, telling Reuters that "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market," and Independents and OPEC "have a shared responsibility in this regard."[114]

**F.     Defendants Continued to Refuse to Increase Supply and Capture Market Share Contrary to Their Unilateral Self Interest.**

96.     In 2022, after Russia invaded Ukraine, crude oil prices spiked. Unlike the steep fall in demand during the early days of COVID-19, this was a supply-side shock that resulted in a decrease in the volume of oil available in the United States market, both from increased strain on supply chains, and more importantly, the separation of Russia's oil production from the world market.

---

[111] *Id.*

[112] Chesapeake Energy Corporation (CHK), *CEO Nick Dell'Osso on Q4 2021 Results - Earnings Call Transcript*, SEEKING ALPHA (Feb. 24, 2022), https://seekingalpha.com/article/4489980-chesapeake-energy-corporation-chk-ceo-nickdellosso-on-q4-2021-results-earnings-call

[113] Lawler & Hiller, *supra* note 94.

[114] *Id.*

97.     By the middle of 2022, the price of oil rose to more than $120 a barrel. At that price, oil cost more than at any point during the five years leading up to the OPEC Price War and was nearly quadruple the Price War's 2016 low water mark.

98.     OPEC responded to the possibility that the high prices might recede by further restraining production, including cutting production in October 2022, by two million barrels per day.[115] These cuts were announced as crude prices began to return to normal from their near-record highs, and were intended to "stabilize the recent fall in global energy prices."[116]

99.     Despite record prices in 2022 and prices that remained consistently high into 2023, in a break from their prior behavior,[117] Defendants continued to act against their rational economic self-interests and refused to increase production:

- In mid-February 2022, as Russian troops gathered on Ukraine's borders, Defendant Pioneer's CEO Scott Sheffield again publicly supported the existence of an agreement between and among Defendants: "In regard to the industry, it's been interesting watching some of the announcements so far, the public[ly listed] [I]ndependents are staying in line," and "I'm confident they will continue to stay in line."[118] Indeed, following the massive January-February 2022 price spike during which oil prices increased 20%, Sheffield emphasized, "[w]hether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans[.]"[119]

---

[115] Jeff Stein, et al., *OPEC, Allies Move to Slash Oil Production, Eliciting Blistering White House Response*, THE WASH. POST (Oct. 5, 2022), https://www.washingtonpost.com/business/2022/10/05/opec-plus-oil-cut-russia-saudi-arabia.

[116] *Id.*

[117] See Lawler & Scheyder, *supra* note 4; Erik Norland, As Oil Prices Plunge, What Will Swing Producers Do?, CME GROUP (Nov. 21, 2018), https://www.cmegroup.com/education/featured-reports/as-oil-prices-plunge-what-will-swing-producers-do.html.

[118] Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE.COM (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-OilWill-Make-Shale-Giants-Drill-Aggressively.html.

[119] *Id.*

- The same week, other Defendants signaled their alignment. During a Q4 earnings call, Defendant Continental's CEO Bill Berry confirmed, "[w]e project generating flat to 5% annual production growth over the next five years . . . ."[120]

- On February 22, 2023, Defendant Diamondback's CEO Travis Stice explained, "we have no reason to put growth before returns . . . we will continue to be disciplined."[121]

- Bloomberg reported a couple of days later on February 24, 2022, that Defendant "EOG Resources Inc. plan[ned] to restrain oil growth [in 2022] despite surging prices, falling into line with most other major U.S. independent shale producers. . . . like [Defendant] Pioneer Natural Resources and [Defendant] Continental Resources[, who] are also limiting increases to less than 5% this year."[122]

- In March 2022, Defendant Occidental's CEO Vicki Hollub stated that Occidental had a "huge inventory of high-quality investments" available around the world, especially in United States shale, but was not acting on those opportunities to expand production, instead focused on maintaining high profits.[123]

---

[120] *Id.*

[121] Geert De Lombaerde, *Diamondback to Keep Production Flat, Invest $1.75 Billion in 2022*, OIL & GAS J. (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22..

[122] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers.

[123] Pippa Stevens, *Oil Producers in a 'Dire Situation' and Unable to Ramp Up Output, Says Oxy CEO*, CNBC (Mar. 8, 2022), https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html.

- On an August 2022 earnings call, Defendant EOG said it planned to keep production growth to "low single digits" in 2023, and it was "committed to remaining disciplined" despite ideal economic conditions for production increases.[124] EOG had previously increased production by only 4% in 2022 and said it was targeting the same increase in 2023.[125]

- In January 2023, Defendant Pioneer's Sheffield confirmed that the "aggressive growth era of US shale is over" and that Pioneer and the other Defendants were "no longer a swing producer."[126]

- In February 2023, Defendant Diamondback's CEO Travis Stice said, "we have no reason to put growth before returns…we will continue to be disciplined."[127]

- When asked in a March 2023 interview why Defendant Occidental was not using its profits to "drill more wells" and "bring down prices," Defendant Occidental's President, Vicki Hollub responded that "prices are in a good place right now," "gas prices at the pump are not so bad at this price," and Occidental had no intention of increasing production to meet global demand

---

[124] EOG Resources (EOG), *Q2 2022 Earnings Call Tr.*, THE MOTLEY FOOL (Aug. 5, 2022), https://www.fool.com/earnings/call-transcripts/2022/08/05/eog-resources-eog-q2-2022-earnings-call-transcript/.

[125] Liz Hampton, *U.S. Shale Producer EOG Sticks to 4% Annual Output Growth*, REUTERS (Aug. 5, 2022), https://www.reuters.com/business/energy/us-shale-producer-eog-maintain-low-single-digit-oil-output-2022-08-05/,

[126] Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

[127] Geert De Lombaerde, *Diamondback to keep production flat, invest $1.75 billion in 2022* OIL & GAS JOURNAL (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22.

and lower United States consumer gas prices, despite having the ability to profitably increase production.[128]

100.   Knowing that Independents' breakeven prices were continuing to fall despite high crude prices,[129] oil industry journalists and analysts expressed disbelief that Defendants were refusing to compete for market share:

- The Washington Post reported that the price increases following the Russian invasion were a "clear signal to raise [shale] production; we're talking Bat-Signal clarity here."[130]

- A February 2022 Bloomberg article questioned why Defendant EOG would not "take advantage of higher prices by pumping more crude from its shale

---

[128] Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

[129] E.g., Press Release, *Continental Resources Announces Record 2021 Results; 2022 Projections Highlight Increasing Cash Flow and Corporate Returns, News Release (Exhibit 99.1)*, SEC ARCHIVES (Feb. 14, 2022), https://www.sec.gov/Archives/edgar/data/732834/000119312522042827/d272362dex991.htm (Defendant Continental reported that for 2022 it was "projecting an approximately $30 WTI free cash flow breakeven price."); Centennial Resource Development Inc., *2022 Corporate Sustainability Report*, PERMIAN RES.COM (2022), https://permianres.com/wp-content/uploads/2022/08/Centennial-2022-Corporate-SustainabilityReport.pdf. ($32 breakeven for Defendant Centennial); *Using Scenarios to Understand Risks, Opportunities*, CHESAPEAKE ENERGY (2023), https://sustainability.chk.com/climate/portfolioresilience/ (Defendant Chesapeake breakeven between $33 and $42); *Investor Relations Presentation, May 2022*, HESS CORP. (May 2022), https://investors.hess.com/staticfiles/3814592c-05ea-4659-9651-88012e29468f (Defendant Hess breakeven ~$45); *The Value Portfolio: Pioneer Natural Resources is Heavily Undervalued*, SEEKING ALPHA (Aug. 9, 2023), https://seekingalpha.com/article/4593056-pioneer-natural-resources-heavily-undervalued (Defendant Pioneer breakeven $39); Irina Slav, *Running Out of Sweet Spots: Shale Growth May Not Materialize*, MARKETS INSIDER (Feb. 7, 2022), https://markets.businessinsider.com/news/stocks/running-out-of-sweet-spots-the-biggest-problem-for-us-shale-1031168908 ("Technologically, oil and gas resources can be stretched to near infinity as drilling technology advances further and further.").

[130] Denning, *supra* note 22.

38

fields."[131] The article said that EOG "plan[ned] to restrain oil growth this year despite surging prices, falling into line with most other major U.S. independent shale producers."[132]

- In March 2022, a CNBC anchor observed, "I know we keep hearing about this key code word from all of the oil companies right now that they are 'disciplined,' but when you see oil at north of 120 dollars a barrel, I mean it's one thing to be disciplined, it's another thing to miss an opportunity."[133]

- The Financial Times published an article in March 2023, titled, "Oil executives warn of higher prices now that OPEC is back 'in charge.'"[134]

- CNBC released a March 2023 article titled, "US won't reach a new oil record in oil production 'ever again' says Pioneer Natural Resources CEO."[135]

- On April 3, 2023, after OPEC made further production cuts, Bloomberg reported that the United States shale industry did not plan to "break a three-year trend" by increasing production in response to rising oil prices, and would not "rescue" United States consumers from high gas prices, despite being "flush with cash after record profits."[136] According to one industry

---

[131] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers

[132] *Id.*

[133] Stevens, *supra* note 123.

[134] Myles McCormick, Derek Brower, & Justin Jacobs, *Oil Executives Warn of Higher Prices Now that OPEC Is Back in Charge*, FIN. TIMES (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9..

[135] Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html

[136] Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, BLOOMBERG (Apr. 3, 2023), https://www.bloomberg.com/news/articles/2023-04-03/opec-surprise-cut-won-t-be-filled-by-us-shale-oil

expert, "OPEC and shale are much more on the same team now, with supply discipline on both sides," which "really puts a floor under the price of oil long term."[137]

101.     Defendants and OPEC continued meeting and communicating throughout 2022 and 2023. At the 2022 CERAWeek held March 6-10, 2022 ("CERAWeek 2022"), Defendants met again with OPEC. Reuters reported that at the time of this conference, "[i]t was at least the fourth time since 2017 that U.S. shale oil producers and OPEC officials have held such meetings to discuss energy concerns."[138] At some point, during CERAWeek 2022, Defendants and OPEC "gathered in a private room at a restaurant and U.S. producers presented OPEC Secretary General Barkindo with a bottle labeled 'Genuine Barnett Shale' – from the oilfield that launched the shale revolution. Barkindo proudly displayed the memento as he left the meeting, which included executives from Hess Corp . . . and Chesapeake Energy."[139] As Reuters noted, Defendants and OPEC "found themselves on similar sides as oil prices have surged well above $100 a barrel: in no rush to rapidly boost production."[140] Defendant Chesapeake's CEO Domenic Dell'Osso confirmed, "[w]ere shale to ramp up output only to have prices fall, we have destroyed a lot of value for shareholders and haven't helped the problem."[141]

102.     Early in 2023, Defendants removed all doubt (if any existed) that they were coordinating with OPEC.

103.     On January 5, 2023, Defendant Pioneer's CEO Sheffield stated that "OPEC ministers are frustrated over the recent price fall," before predicting that forthcoming production was "going to change . . . . If [price] stays too low, it wouldn't surprise me if [OPEC] ha[s]

---

[137] *Id.*

[138] Liz Hampton & Arathy Somasekhar, *OPEC Meets with U.S. Shale Executives as Oil Prices Skyrocket*, REUTERS (Mar. 7,2022), https://www.reuters.com/business/opec-meet-with-us-shale-executives-us-energy-conference-oil-prices-skyrocket-2022-03-08/.

[139] Hampton, *supra* note 37.

[140] *Id.*

[141] *Id.*

another cut . . . . [W]e'll see what happens in the next 90 days."[142] Less than three months later, OPEC "shocked traders around the world"[143] when it announced a "surprise" production cut, despite the fact that OPEC "had been largely expected to stick to its already agreed 2m bpd cuts."[144]

104.    Between Sheffield's prediction and OPEC's announcement, on March 27, 2023, news emerged that some Defendants, including at least Pioneer (Sheffield's company) and EOG, had pulled back the hedge positions they had previously established to protect against downward oil price movements.[145] This left Defendants "suddenly vulnerable" and exposed them to massive economic risk if oil prices went down.[146] Sheffield defended the extraordinarily risky move, stating "we're not going to hedge," and stated that he was still "optimistic that we'll see $100 a barrel before the end of the year."[147]

105.    On April 2, 2023, less than a week after news emerged of Defendants' exposed positions, OPEC announced its "surprise" production cut, slashing 1.15 million barrels of oil production per day.[148] The only plausible explanation for Defendants' failure to hedge was their advanced knowledge of OPEC's planned production cuts.

106.    Earlier, in March, 2023, the Financial Times reported that United States shale executives, including at least Defendant Pioneer's Sheffield, Defendant Chesapeake's Dell'Osso,

---

[142] Kevin Crowley, *One Shale Executive Correctly Called OPEC+'s Surprise Output Cut*, BLOOMBERG (Apr. 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/one-shale-executive-correctly-called-opec-s-surprise-output-cut

[143] *Id.*

[144] Reuters, *OPEC+ Announces Surprise Cuts in Oil Production*, THE GUARDIAN (Apr. 2, 2023), https://www.theguardian.com/business/2023/apr/02/opec-announces-surprise-cuts-in-oil-production-of-about-115-mbpd.

[145] Justin Jacobs, *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FIN. TIMES (Mar. 28, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.

[146] *Id.*

[147] *Id.*

[148] Reuters, *supra* note 144.

Defendant Diamondback's Stice, Defendant Occidental's Hollub, and Defendant Hess's John Hess met with OPEC Secretary General-elect Haitham Al Ghais[149] for a private dinner "in a downtown Houston steakhouse" to reaffirm their agreement to restrict production, "[d]espite recent record profits."[150] One person who attended the dinner reported that during dinner, "[t]he shale executives pressed Al Ghais on how much spare production capacity OPEC could deploy, and offered their own assessment of how much extra output the US could deliver this year - a range between 400,000 and 600,000 b/d, according to one person at the dinner."[151] In the same article, Sheffield doubled down on his support of OPEC: "I think the people that are in charge now are three countries - and they'll be in charge the next 25 years. . . . Saudi first, UAE second, Kuwait third."[152]

107.    One energy industry analyst fittingly summarized the effects of Defendants' output constraint agreement:

> In its early days, shale behaved like a dimmer, with output growth accelerating proportionally as oil prices were dialed up. That ability to respond quickly to the market was due to the speed at which shale wells could be developed: a few months compared to the years or decades of Big Oil projects. Today, shale is as responsive as in the past. But there's a difference. The dimmer appears to be capped at a certain level: No matter how high oil prices go above that level – say $100 a barrel – the industry will no longer add rigs to sop up market share. Rather, it will stay put and go into harvest mode with existing wells – that's exactly what happened in 2022, much to the consternation of the White House, which urged shale companies to drill more.[153]

---

[149] In January 2022, OPEC declined to grant Mohammad Sanusi Barkindo a third term as Secretary General and chose Haitham Al-Ghais, a veteran oil official from Kuwait, as his successor. Barkindo was scheduled to leave his position at the end of July 2022, but on July 5, he passed away. According to the New York Times, "[t]here is no indication that the change of leadership will influence how much oil OPEC produces." Stanley Reed, *Mohammad Barkindo, OPEC's top official, dies*, THE N.Y. TIMES (July 6, 2022), https://www.nytimes.com/2022/07/06/business/opec-barkindo.html.

[150] Myles McCormick, et al., *Oil Executives Warn of Higher Prices Now that OPEC Is Back in Charge*, FIN. TIMES (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[151] *Id.*

[152] *Id.*

[153] Blas, *supra* note 27.

42

108.   As demonstrated previously, Defendants had the ability to increase crude oil production and gain market share as swing producers; they just chose not to.

109.   Defendants' agreement to constrain United States shale oil production was a success. They continue to enjoy massive revenue increases, while not reinvesting that additional revenue into new production or otherwise increasing supply. Compare Figure 4 with Figures 5, 6, 7, 8, 9, 10, and 11 (recording Defendants' revenue growth after 2020).

**Figure 4. United States Shale Producer's Reinvestment Rate (capital expenditure as a percentage of operational cash flow)**



**Figure 5. Pioneer's Annual Revenue (USD)**



**Figure 6. Permian/Centennial's Annual Revenue (USD)**



**Figure 7. Chesapeake's Annual Revenue (USD)**



**Figure 8. Continental's Annual Revenue (USD)**



1

**Figure 9. Diamondback's Annual Revenue (USD)**

2



3
4
5
6
7
8
9
10
11
12
13

**Figure 10. EOG's Annual Revenue (USD)**

14
15



16
17
18
19
20
21
22
23
24
25
26
27

**Figure 11. Occidental's Annual Revenue (USD)**



**G.     Absent Conspiracy, Defendants' "Restraint" Is Economically Irrational.**

110.    Defendants used a variety of terms and phrases as code for their mutual agreement to coordinate and restrain United States shale oil production, such as "disciplined," focusing on "value growth," "staying in line," or operating for "shareholder returns." Further, Defendants' repeated public confirmation of their production discipline was an admission that they each had spare productive capacity that they chose not to utilize.

111.    In a competitive market for an important commodity, such as crude oil, when prices are higher than firms' marginal costs, expanding production to take advantage of prices above a company's breakeven point is economically rational. Indeed, companies would compete to drill available oil. If a company does not seize such an opportunity, its competitors will, taking market share and reinvesting additional profits into further productive capacity and/or efficiency gains. Thus, with oil prices far above each Defendant's "break-even" point, Defendants had enormous incentives to pursue additional crude oil production.

112.    Also in a competitive market, it would be against a Defendant's economic self-interest to restrain production unless it knew its competitors would also restrain production.

Individually, no United States shale oil producer had market power sufficient to constrain overall United States shale oil outputs in any meaningful way, let alone global outputs. However, together Defendants had substantial power in the United States market—especially with respect to the swing production that mattered most to global prices. Together, the Defendants could substantially constrain that portion of United States crude oil production most important to the global price of oil and, as a result, they could exercise their power to negotiate cartel supply restrictions with OPEC and insure themselves against competition from other major swing producers.

113.    The supermajors and many smaller Independents (not part of the cartel) did respond to these potential incentives associated with increased production. In direct response to United States shale producers "underinvesting as an industry," the supermajors started investing in shale in 2021 and 2022 at rates previously unseen, despite being traditionally conservative and historically known to view fracking as a waste of time (in part because their overhead structure made small-scale operations relatively more expensive).[154]

114.    ExxonMobil planned to boost its 2022 production level in the Permian Basin by 25% in response to record high crude oil prices.[155]

115.    Similarly, Chevron planned on a 10% increase in the same region in 2022 "from an even larger production base."[156] Halfway through 2022, Chevron anticipated a "15% year-

---

[154] Clifford Krauss, *What Exxon & Chevron are Doing with Those Big Profits*, THE N.Y. TIMES (Feb. 1, 2023), https://www.nytimes.com/2023/02/01/business/energy-environment/exxon-chevron-oil-gas-profit.html.

[155] Kevin Crowley, et al., *Exxon and Chevron Plan Permian Oil Surge as Peers Preach Caution*, BLOOMBERG (Feb. 2, 2022), https://www.bloomberg.com/news/articles/2022-02-01/exxon-joins-chevron-in-permian-oil-surge-as-peers-preach-caution.

[156] *Id.*

over-year increase" in shale oil production from 2021 and promised to continue "bolstering production."[157]

116.    In May 2023, ExxonMobil CEO Darren Woods announced that Exxon intended to double the amount of oil produced from its U.S. shale holdings over a five-year period using new technologies.[158]

117.    Smaller, non-public shale companies also took advantage of the high prices and drilled the available oil. In 2022, "[s]maller, privately held firms . . . raised production in response to higher prices and are going full steam ahead."[159] Due to the gap in production left by Defendants, these smaller private producers "lead output gains during the highest [crude oil] prices in seven years."[160] For example, Reuters reported, "Tall City Exploration, a privately-backed Permian [basin] producer, added a second drilling rig . . . and is eying a three-fold increase" from 2021 in 2022 production.[161]

118.    But small shale oil producers are limited in the speed at which they can add supply and increase production because they lack economies of scale, have less capital, less access to limited resources like drilling rigs, and are less able to scale up and operate multiple drilling projects simultaneously. Additionally, going from one rig to two is not enough to meaningfully move United States production when Defendants control 18% of the total active oil rigs in the United States, including conventional oil rigs and rigs owned by supermajors.[162] With those rigs,

---

[157] *Chevron to Boost Permian Oil Production as Demand for Reliable Energy Grows*, CHEVRON (June 16, 2022), https://www.chevron.com/newsroom/2022/q2/chevron-to-boost-permian-oil-production-as-demand-for-reliable-energy-grows.

[158] Sabrina Valle, *Exxon CEO Says Technology Advances Could Double Its Shale Output*, REUTERS (June 1, 2023), https://www.reuters.com/business/energy/exxon-ceo-says-5-year-program-could-double-its-shale-output-2023-06-01/.

[159] Liz Hampton, *U.S. Shale Oil Forecasts Keep Rising as Smaller Producers Lead the Way*, REUTERS (Mar. 2, 2022), https://www.reuters.com/business/energy/us-shale-oil-forecasts-keep-rising-smaller-producers-lead-way-2022-03-02/.

[160] *Id.*

[161] *Id.*

[162] Data obtained from https://oilgasleads.com/top-drilling-company/.

in 2023, Defendants were responsible for approximately 16.2% of United States total crude oil production (including conventional crude oil).

119.    Defendants are able to leverage their collective market share because of how fragmented the United States oil market is – of the almost 250 companies operating oil rigs in the United States, 162 companies are running just one rig.[163] Only 10 companies own 15 or more rigs – five are Defendants (EOG, Occidental, Pioneer, Diamondback, and Continental), and three of the other five are supermajors (Exxon, Chevron, and ConocoPhillips).[164]

120.    Moreover, Defendants' market power is exacerbated by the fact that conventional oil production in the United States is largely fixed and cannot quickly add or remove production volume in response to price changes.

121.    When Defendants' production and capacity are combined with that of the OPEC and OPEC+ member countries, the resulting cartel formed by these entities controls approximately 60% of the total global oil production and nearly all total global oil production capable of quickly responding to sudden price variations on a short-term basis.

122.    Defendants' agreement by and between themselves and OPEC to coordinate United States shale oil production is *per se* illegal under the Sherman Act.

## PLUS FACTORS

123.    In addition to Defendants' and OPEC's statements quoted above, the existence of the conspiracy alleged herein is supported by "plus factors" and "super plus factors," which render the United States shale oil industry highly conducive to collusion. Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated

---

[163] *Id.*

[164] See *supra* note 161.

action," and therefore support an inference of collusion.[165] "Super plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."[166]

124. The following plus and super plus factors alleged herein support an inference that Defendants' actions are the product of collusion and not pro-competitive, unilateral conduct:

- The market conditions for United States shale oil are favorable to collusion. As discussed above, the United States shale oil industry is highly fragmented, with a small number of larger producers and hundreds of smaller producers. These larger producers (Defendants) have excess capacity and regularly participate in industry trade associations, giving them ample time and opportunity to collude, coordinate supply restraints and police cheating on the conspiracy. As detailed above, Defendants did in fact meet during trade association gatherings, including annually at the CERAWeek Conference in Houston, TX, to discuss their internal cooperation and the overall cooperation with OPEC by all Defendants to maintain that excess capacity.

- Shale oil is a commodity, thus facilitating price-fixing negotiations amongst would-be competitors.

- The market conditions for crude oil sold in the United States are susceptible to the price effects of collusion because it, and the downstream products for which it is the key input, such as Heating Oil, are daily-use commodities. Accordingly, there are no reasonable substitutes and/or high switching costs, leading to highly inelastic demand, which enables producer cartels to

---

[165] William E. Kovacic, et al., *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[166] *See id.* at 426.

51

extract monopoly rents from consumers who are unable to avoid price increases.

- The majority of the oil market is already explicitly cartelized due to the existence of OPEC and OPEC+.

125. Defendants' actions during the Class Period were against each Defendant's independent self-interest because no rational economic company facing strong incentives to increase shale oil production and capture market share would forgo such opportunities, but for the existence of an agreement with other producers who had already committed to similarly constrain production and maintain crude oil prices at artificially high levels. As detailed above, Defendants repeatedly met with each other and OPEC representatives and discussed amongst themselves and with OPEC representatives their confidential business plans, including forward-looking production and capacity information. No rational business would share this proprietary and competitively sensitive information with a direct competitor, absent collusion. Following these exchanges, Defendants then decided not to increase their respective production volumes when that would have been in their individual rational economic best interests, given rising prices. Defendants also repeatedly communicated forward-looking production data and publicly commented on each other's production announcements in a manner that would be irrational, absent an agreement.

126. In addition, Defendants' decisions not to increase production were made in an environment where Defendants regularly met with one another and with OPEC, wherein they discussed their confidential business plans (including forward-looking production and capacity information) in a manner that would be economically irrational absent the alleged conspiracy.

## CLASS ACTION ALLEGATIONS

127. Plaintiffs bring this action as a class action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2) as representatives of a class of indirect purchasers seeking injunctive relief ("Nationwide Injunctive Relief Class") defined as:

All persons or entities who purchased Heating Oil in the United States from January 1, 2021 until Defendants' unlawful conduct and its anticompetitive effects cease to persist.

128. Plaintiffs also bring this action as a class action on behalf of themselves and all others similarly situated under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class ("State Law Class"):

All persons or entities who purchased Heating Oil in Alabama, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, and/or Vermont from January 1, 2021 until Defendants' unlawful conduct and its anticompetitive effects cease to persist.

129. Specifically excluded from both the Nationwide Injunctive Relief Class and the State Law Class (collectively, the "Classes") are Defendants; any of their officers, directors, or employees; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from both Classes are any federal, state, or local governmental entities; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

130. Plaintiffs reserve the right to modify these definitions and/or to propose subclasses, as appropriate, based on further investigation and discovery.

131. **Numerosity**. The members of both Classes are so numerous as to make joinder of all members impracticable. Although the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that due to the nature of the product market, the number of members is estimated to be in the millions. The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the court. The members of the Classes should be readily identifiable from existing records, including information and records in Defendants' possession, custody, or control.

53

132.   **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Classes because they were all similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for Heating Oil sold in the United States, resulting from Defendants' conspiracy to fix prices in the crude oil market.

133.   **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the members of both Classes. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Classes. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions generally, and in antitrust litigation specifically, in numerous industries and courts throughout the nation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and they have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Classes.

134.   **Common Questions of Law and Fact Predominate**. There are numerous questions of law and fact common to Plaintiffs and members of the Classes, the answers to which will advance the resolution of the litigation as to all Class members and which predominate over any individual question. Plaintiffs and both Classes were injured by the same unlawful price-fixing conspiracy, Defendants' anticompetitive conduct was generally applicable to all members of the Classes, and relief to both Classes as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

    i.      whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of crude oil and/or Heating Oil in the United States;

    ii.     the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

    iii.   whether such combination or conspiracy violated the antitrust, unfair competition, and consumer protection laws of various states;

iv.   whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiffs and the other members of the Classes;

v.   whether Defendants caused Plaintiffs and the members of the Classes to suffer damages in the form of overcharges on Heating Oil;

vi.   the effect of Defendants' conspiracy on the prices of Heating Oil sold in the United States during the Class Period;

vii.   the appropriate measure of class-wide damages for both Classes; and

viii.   the nature of appropriate injunctive relief to restore competition in the United States market for Heating Oil.

135.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including issues relating to liability and damages.

136.   **Superiority**. Plaintiffs and the members of the Classes have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the court and the

litigants, and will promote consistency and efficiency of adjudication. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

137.    **Injunctive Relief**. Defendants have acted or refused to act on grounds generally applicable to the members of the Nationwide Injunctive Relief Class, making injunctive and corresponding declaratory relief appropriate with respect to this Class as a whole pursuant to Federal Rule of Civil Procedure, Rule 23(b)(2).

## ANTITRUST INJURY

### A.    Defendants' Conspiracy Inflated the Price of Crude Oil Throughout the Class Period.

138.    Historically, global crude oil demand was primarily met by oil obtained from conventional drilling. Following the Shale Revolution, the influence of United States shale production on crude oil prices (and Heating Oil prices) is widely recognized by market analysts and economists. For example:

- In a 2017 article titled "The oil market in the age of shale oil," economists concluded that, since 2014, United States shale oil has affected oil prices by increasing global crude oil supply and influencing OPEC policies.[167]

- A Forbes article from 2019, claimed that "without the U.S. shale oil boom, [crude] oil prices would have never dropped back below $100/bbl" because, since 2008, "U.S. oil production increased by 8.5 million bpd – equal to 73.2% of the global increase in production."[168]

---

[167] Irma Alonso Alvarez 7 Virginia Di Nino, *The oil market in the age of shale oil*, 8 ECB ECON. BULLETIN, 57-74 (2017).

[168] Robert Rapier, *The U.S. Accounted for 98% of Global Oil Production Growth in 2018*, FORBES (June 23, 2019), https://www.forbes.com/sites/rrapier/2019/06/23/the-u-s-accounted-for-98-of-global-oil-production-growth-in-2018/?sh=249e989b5125.

- In October 2019, the Executive Office of the United States President's Council of Economic Advisors declared that the United States Shale Revolution has "reduced the global price of oil by 10 percent" since 2007.[169]

- In 2020, economists from the Federal Reserve Bank of Dallas found that without the Shale Revolution, oil prices would have risen by 36% in 2018.[170]

- In 2023, an article in the International Journal of Energy Economics and Policy stated that, in the past, "[t]he increase in US crude oil production, driven by shale oil . . . significantly increased oil supply, directly affecting the price of crude oil . . . ."[171]

139.    As noted above, Defendants wield power over crude oil prices because as "swing producers" in the global crude oil market, their output decisions have a disproportionate impact on the price of crude oil.[172] This means that when competing with each other (and OPEC), as the largest Independents in a very fractured production landscape, Defendants have sufficient market power to dictate whether the United States can and will produce enough shale oil in response to high crude prices to "swing" the market and push prices down.

140.    Defendants publicly acknowledge that they have this power and claim that they choose not to use it. In March 2022, the New York Times reported that "[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental

---

[169] *The Value of U.S. Energy Innovation & Policies Supporting the Shale Revolution*, COUNCIL OF ECON. ADVISORS (Oct. 2019), https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/10/The-Value-of-U.S.-Energy-Innovation-and-Policies-Supporting-the-Shale-Revolution.pdf.

[170] Nathan S. Balke, et al., *The Shale Revolution and the Dynamics of the Oil Market*, FED. RESERVE BANK OF DALLAS (June 17, 2020), https://www.dallasfed.org/-/media/documents/research/papers/2020/wp2021.pdf.

[171] Rodhan, *supra* note 29, at 433-43.

[172] Lee, *supra* note 26.

Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices . . . ."[173]

141.    Since at least 2021, Defendants have collectively coordinated their production decisions, leading to production growth rates lower than would be seen in a competitive market, despite high oil prices and healthy global demand.

142.    Despite production increases from supermajors and smaller private producers, Defendants' production restraint has had a considerable impact on total United States shale oil production. In 2022 alone, shale oil production in the United States increased by only 500,000 barrels, which was 50% short of market analysts' general yearly estimates.[174]

143.    The difference between the amount of shale oil that was actually produced in the United States and the amount of shale oil that would have been produced but for Defendants' conspiracy led to artificially inflated prices for crude oil, which caused Plaintiffs and the members of the proposed Classes to pay higher prices for Heating Oil than they otherwise would have (as discussed below).

**B.    Plaintiffs and the Members of the Proposed Classes Paid Artificially Inflated Prices for Heating Oil as a Result of Defendants' Conspiracy.**

144.    Most Heating Oil is supplied by United States refineries that send Heating Oil to storage terminals for distribution to consumers.[175] Heating Oil is generally transported by rail or barge to larger storage facilities, and then transported by truck to smaller storage tanks for sale to customers, who typically have Heating Oil delivered directly to their home.[176]

---

[173] Stanley Reed, As Oil Soars, *OPEC and Its Allies Decline to Offer Relief*, The N.Y. TIMES (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html.

[174] Eric Rosenbaum, *Oil CEOs are Doubling Down on Buybacks as Biden Budget Seeks to Quadruple Tax*, CNBC (Mar. 7, 2023), https://www.cnbc.com/2023/03/07/oxy-ceo-doesnt-seem-worried-about-politics-of-buybacks-gas-prices.html.

[175] *Heating oil explained - Where our heating oil comes from*, U.S. ENERGY INFO. ADMIN. (last updated Oct. 19, 2013), https://www.eia.gov/energyexplained/heating-oil/where-our-heating-oil-comes-from.php.

[176] *Id.*

145.    According to the United States Energy Information Administration ("EIA"), "[n]early all of the heating oil consumed in the United States is produced from crude oil."[177] Accordingly, the cost of crude oil is one of the primary drivers of Heating Oil prices, as it accounts for just under half the average price of Heating Oil.[178, 179] As noted by one website, "[h]eating oil is derived from crude oil, so the price of crude oil has a major effect on the price of heating oil.[180]

146.    As demonstrated by Figure 12 below, prices paid by consumers for Heating Oil closely mirror the prices both for crude oil and gasoline sold in the United States.

---

[177] *Heating Oil Explained*, U.S. ENERGY INFO. ADMIN. (last updated Oct. 19, 2023), https://www.eia.gov/energyexplained/heating-oil/.

[178] *Heating oil explained - Heating oil prices and outlook*, U.S. ENERGY INFO. ADMIN. (last updated Oct. 13, 2023), https://www.eia.gov/energyexplained/heating-oil/prices-and-outlook.php.

[179] *Heating oil explained - Factors affecting heating oil prices*, U.S. ENERGY INFO. ADMIN. (last updated Oct. 19, 2023), https://www.eia.gov/energyexplained/heating-oil/factors-affecting-heating-oil-prices.php.

[180] Lawrence Pines, *Heating Oil: How Is This Crucial Energy Commodity Made?*, COMMODITY.COM (last updated Mar. 22, 2022), https://commodity.com/energy/heating-oil/.

1

**Figure 12. Heating Oil vs. Gasoline vs. Crude Oil Spot Prices**



Data source: U.S. Energy Information Administration

147.    Accordingly, the price of crude oil has a direct effect on the price of Heating Oil. This is because crude oil is the primary raw material used to produce the Heating Oil sold throughout the United States. As a result, Defendants' conspiracy not only inflated the price of crude oil, it also inflated the price of Heating Oil sold in the United States during the Class Period, which had a direct effect on Plaintiffs and the members of the Classes who were forced to purchase Heating Oil at these artificially inflated prices.

## CLAIMS FOR RELIEF

### A.    VIOLATION OF THE SHERMAN ACT

#### COUNT 1
#### VIOLATION OF 15 U.S.C. §1
#### (On Behalf of the Nationwide Injunctive Relief Class)

148.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

149.    From at least January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing

agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize prices for crude oil and Heating Oil in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

150.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the fixing, raising, and stabilizing of the price of crude oil and Heating Oil.

151.   The combination and conspiracy alleged herein has had the following effects, among others:

- Price competition in the sale of crude oil has been restrained, suppressed, and/or eliminated in the United States;

- Prices for crude oil sold by Defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

- Those who purchased Heating Oil indirectly from Defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition, and paid artificially high prices for Heating Oil.

152.   Plaintiffs and members of the Nationwide Injunctive Relief Class have been injured and will continue to be injured in their businesses and property by paying more for Heating Oil purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

153.   Plaintiffs and members of the Nationwide Injunctive Relief Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**B.     VIOLATIONS OF STATE ANTITRUST, UNFAIR COMPETITION, AND CONSUMER PROTECTION LAWS**

154.    Plaintiffs reallege and incorporate by reference all of the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates those allegations as if fully set forth therein.

155.    During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, decrease, stabilize, or maintain at artificially low levels, the production of shale oil in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust, unfair competition, and consumer protection laws set forth below.

156.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including agreeing to fix, decrease, maintain, or stabilize shale oil production at artificially low levels, thereby raising, fixing, and stabilizing crude oil prices, which injured Plaintiffs and members of the Classes; exchanging competitively sensitive information between and among Defendants; and participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

157.    Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the State Law Class were deprived of free and open competition and paid more to purchase Heating Oil than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust, unfair competition, and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

158.     In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of, and to the detriment of, Plaintiffs and the members of the Classes.

159.     Accordingly, Plaintiffs and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

160.     Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust, unfair competition, and consumer protection statutes.

161.     In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

## COUNT 2: ALABAMA
### (On Behalf of Class Members that Purchased Heating Oil in Alabama)

162.     Due to Defendants' unlawful conduct, (1) competition for crude oil and Heating Oil was restrained, suppressed, and eliminated within Alabama; (2) Heating Oil prices in the State of Alabama were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 *et seq*. Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiffs and members of the Class seek all forms of relief available under ALA. CODE §6-5-60 *et seq*.

## COUNTS 3 & 4: ARIZONA
### (On Behalf of Class Members that Purchased Heating Oil in Arizona)

163.     Defendants' conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout Arizona; (2) prices of Heating Oil in the State of Arizona were raised, fixed, maintained, and stabilized at

artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

164.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq*.

165.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. Ann. §44-1521 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 5 & 6: CALIFORNIA
**(On Behalf of Class Members that Purchased Heating Oil in California)**

166.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout California; (2) Heating Oil prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

167.    Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce. Each Defendant has acted in violation of CAL. BUS. & PROF. CODE §16720 to fix, reduce, stabilize, and maintain crude oil production. The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, reduce, maintain, and stabilize the production of United States shale oil. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the

64

price of Heating Oil. As a result of Defendants' violation of CAL. BUS. & PROF. CODE §16720, Plaintiffs and members of the Class seek treble damages and their costs of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

168.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 7 & 8: COLORADO
### (On Behalf of Class Members that Purchased Heating Oil in Colorado)

169.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout Colorado; (2) Heating Oil prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

170.    Defendants have violated Colo. Rev. Stat. §6-4-101 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Colo. Rev. Stat. §6-4101, *et seq.*

171.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. §6-1-101 *et seq.* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 9: CONNECTICUT
### (On Behalf of Class Members that Purchased Heating Oil in Connecticut)

172.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout Connecticut; (2) Heating Oil prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct

substantially affected Connecticut commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Conn. Gen. Stat. §3524 *et seq*.

## COUNTS 10 & 11: DISTRICT OF COLUMBIA
### (On Behalf of Class Members that Purchased Heating Oil in District of Columbia)

173.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Heating Oil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and purchased Heating Oil in the District of Columbia, paid supracompetitive, artificially inflated prices for Heating Oil. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

174.    Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. CODE, §28-4501 *et seq*.

175.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE, §28-3901 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 12 & 13: FLORIDA
### (On Behalf of Class Members that Purchased Heating Oil in Florida)

176.    Through their actions and actions of co-conspirators, crude oil and Heating Oil prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the Heating Oil market was restrained, suppressed, and eliminated throughout Florida. Plaintiffs and members of the Class, including those who purchased Heating Oil in the State of Florida, paid

supracompetitive, artificially inflated prices for Heating Oil. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

177.    Defendants have violated FLA. STAT. §542.15 *et seq.*, through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under FLA. STAT. §542.15 *et seq*.

178.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 14: HAWAII
### (On Behalf of Class Members that Purchased Heating Oil in Hawaii)

179.    Defendants have violated Haw. Rev. Stat. Ann. §480-1 *et seq.*, through their actions. *See* HAW. REV. STAT. §§480-4, 480-13. Through Defendants' actions and the actions of their co-conspirators, Heating Oil prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of Hawaii. Plaintiffs and members of the Class, including those who resided in the State of Hawaii and purchased Heating Oil in Hawaii, paid supracompetitive, artificially inflated prices for their Heating Oil. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq*.

## COUNTS 15 & 16: ILLINOIS
### (On Behalf of Class Members that Purchased Heating Oil in Illinois)

180.    Defendants' combinations or conspiracies had the following effects: (1) price competition in the crude oil and Heating Oil market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) Heating Oil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

181.    Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq*.

182.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1 *et seq*, and 720 Ill. Comp. Stat. 295/1a, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 17: IOWA
### (On Behalf of Class Members that Purchased Heating Oil in Iowa)

183.    Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) Heating Oil prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE §553.1 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1 *et seq*.

### COUNT 18: KANSAS
### (On Behalf of Class Members that Purchased Heating Oil in Kansas)

184.    Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. ANN. §50-101 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of Kansas; (2) Heating Oil prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under KAN. STAT. ANN. §50-101 *et seq*.

68

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

### COUNT 19: MAINE
**(On Behalf of Class Members that Purchased Heating Oil in Maine)**

185.    Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. STAT. TIT. 10, §1101. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of Maine; and (2) Heating Oil prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under ME. STAT. TIT. 10, §1104.

### COUNTS 20 & 21: MARYLAND
**(On Behalf of Class Members that Purchased Heating Oil in Maryland)**

186.    Defendants' combinations or conspiracies detrimentally affected price competition in the State of Maryland for crude oil and Heating Oil by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Heating Oil prices in the State of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

187.    Defendants violated MD. CODE ANN., COM. LAW §11-201 *et seq*., by entering into an unlawful agreement in restraint of trade in the State of Maryland. Accordingly, Plaintiffs and members of the Class seek all relief available under MD. CODE ANN., COM. LAW §11-201 *et seq*.

188.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law §13-101 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 22 & 23: MASSACUSETTS
**(On Behalf of Class Members that Purchased Heating Oil in Massachusetts)**

189.    Defendants' combinations or conspiracies detrimentally affected price competition in the State of Massachusetts for crude oil and Heating Oil by restraining,

suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Heating Oil prices in the State of Massachusetts at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce.

190.    Defendants violated Mass. G.L. c. 93A, *et seq*., by entering into an unlawful agreement in restraint of trade in the State of Massachusetts. Accordingly, Plaintiffs and members of the Class seek all relief available under Mass. G.L. c. 93A, *et seq*.

191.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law §13-101 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 24 & 25: MICHIGAN
**(On Behalf of Class Members that Purchased Heating Oil in Michigan)**

192.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) Heating Oil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

193.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH. COMP. LAWS §445.771 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under MICH. COMP. LAWS §445.771 *et seq*.

194.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws §445.903 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 26 & 27: MINNESOTA
**(On Behalf of Class Members that Purchased Heating Oil in Minnesota)**

195.    Through their actions and the actions of their co-conspirators, Heating Oil prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high

level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition in the market for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of Minnesota. Plaintiffs and members of the Class, including those who resided in the State of Minnesota and purchased Heating Oil there, paid supracompetitive, artificially inflated prices for Heating Oil. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

196.   Defendants have violated MINN. STAT. §325D.49 *et seq*., through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under MINN. STAT. §325D.49 *et seq*.

197.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. Minn. Stat. §325d.43-48 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 28: MISSISSIPPI
**(On Behalf of Class Members that Purchased Heating Oil in Mississippi)**

198.   Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE ANN. §75-21-1 *et seq*. *See* Miss. Code Ann. §75-57-63. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) Heating Oil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected the State of Mississippi commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under MISS. CODE ANN. §75-21-1 *et seq*., and MISS. CODE ANN. §75-5763.

### COUNTS 29 & 30: NEBRASKA
**(On Behalf of Class Members that Purchased Heating Oil in Nebraska)**

199.   Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout

the State of Nebraska, and (2) Heating Oil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

200. Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. §59-801 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under NEB. REV. STAT. §59-801 *et seq*.

201. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 31 & 32: NEVADA
### (On Behalf of Class Members that Purchased Heating Oil in Nevada)

202. Defendants' conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of Nevada; (2) Heating Oil prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

203. Defendants violated Nev. Rev. Stat. Ann. §598A.210 *et seq*., by entering into an unlawful agreement in restraint of trade in the State of Nevada. As a result of Defendants' violation of Nev. Rev. Stat. Ann. §598A.210 *et seq*., Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Nev. Rev. Stat. Ann. §598A.210.

204. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## COUNTS 33 & 34: NEW HAMPSHIRE
### (On Behalf of Class Members that Purchased Heating Oil in New Hampshire)

205. Defendants' combinations or conspiracies detrimentally affected price competition in the State of New Hampshire for crude oil and Heating Oil by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Heating Oil prices in the State of New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

206. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

207. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §358-A:1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 35 & 36: NEW MEXICO
### (On Behalf of Class Members that Purchased Heating Oil in New Mexico)

208. Defendants' combinations or conspiracies detrimentally affected price competition in the State of New Mexico for crude oil and Heating Oil by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Heating Oil prices in the State of New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

209. Defendants violated N.M. STAT. ANN. §57-1-1 *et seq.*, by entering into an unlawful agreement in restraint of trade in the State of New Mexico. Accordingly, Plaintiffs and members of the Class seek all relief available under N.M. STAT. ANN. §57-1-1 *et seq.*

1
2
3

210.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

4
5

### COUNT 37: NEW YORK
**(On Behalf of Class Members that Purchased Heating Oil in New York)**

6
7
8
9
10
11
12
13
14

211.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of New York, and (2) Heating Oil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New York. The conduct set forth above is a *per se* violation of the Donnelly Act, N.Y. GEN. BUS. LAW §340 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under N.Y. GEN. BUS. LAW §340 *et seq.*

15
16

### COUNT 38: NORTH CAROLINA
**(On Behalf of Class Members that Purchased Heating Oil in North Carolina)**

17
18
19
20
21
22
23
24

212.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) Heating Oil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Carolina. Accordingly, Plaintiffs and members of the Class seek all relief available under N.C. GEN. STAT. §75-1 *et seq.*

25
26
27

1

**COUNT 39: NORTH DAKOTA**
**(On Behalf of Class Members that Purchased Heating Oil in North Dakota)**

2

3        213.    Defendants' actions have violated N.D. CENT. CODE §51-08.1-01 *et seq*. through

4    their anticompetitive actions. Through their actions and the actions of co-conspirators, Heating Oil

5    prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high

6    levels, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition in

7    the market for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the

8    State of North Dakota. Plaintiffs and members of the Class, including those who resided in the State

9    of North Dakota and purchased Heating Oil there, paid supracompetitive, artificially inflated prices.

10   During the Class Period, Defendants' illegal conduct substantially affected commerce in the State

11   of North Dakota. Accordingly, Plaintiffs and members of the Class seek all forms of relief available

12   under N.D. CENT. CODE §51-08.1-01 *et seq*.

13

**COUNTS 40 & 41: OREGON**
**(On Behalf of Class Members that Purchased Heating Oil in Oregon)**

14       214.    Defendants' combinations or conspiracies had the following effects: (1) price

15   competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout

16   the State of Oregon; (2) Heating Oil prices in the State of Oregon were raised, fixed, maintained,

17   and stabilized at artificially high levels; and (3) individuals have been deprived of free and open

18   competition. During the Class Period, Defendants' illegal conduct substantially affected

19   commerce in the State of Oregon.

20       215.    Defendants have entered into an unlawful agreement in restraint of trade in

21   violation of OR. REV. STAT. §646.725 *et seq*. Accordingly, Plaintiffs and members of the Class

22   seek all forms of relief available under OR. REV. STAT. §646.725 *et seq*.

23       216.    Defendants have engaged in unfair competition or unfair or deceptive acts or

24   practices in violation of Or. Rev. Stat. §646.605 *et seq*., and, accordingly, Plaintiffs and members

25   of the Class seek all relief available under that statute.

26

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**COUNTS 42 & 43: RHODE ISLAND**
**(On Behalf of Class Members that Purchased Heating Oil in Rhode Island)**

217.    Defendants' combinations or conspiracies detrimentally affected price competition in the State of Rhode Island for crude oil and Heating Oil by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Heating Oil prices in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

218.    Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §6-36-7 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under R.I. Gen. Laws §6-36-7 *et seq*.

219.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §6-13.1-1, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 44 & 45: SOUTH DAKOTA**
**(On Behalf of Class Members that Purchased Heating Oil in South Dakota)**

220.    Through Defendants' actions and the actions of their co-conspirators, Heating Oil prices in the State of South Dakota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition in the market for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of South Dakota. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota. Plaintiffs and members of the Class, including those who resided in the State of South Dakota and purchased Heating Oil there, paid supracompetitive, artificially inflated prices for their Heating Oil.

221.    Defendants have violated S.D. CODIFIED LAWS §37-1-3.1 *et seq*., through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq*.

222.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §37-24-1 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 46: TENNESSEE
### (On Behalf of Class Members that Purchased Heating Oil in Tennessee)

223.    Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for the sale of Heating Oil, a tangible good, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for Heating Oil, a tangible good, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq*.

## COUNT 47: UTAH
### (On Behalf of Class Members that Purchased Heating Oil in Utah)

224.    Defendants violated UTAH CODE ANN. §76-10-3101 *et seq*. by entering into unlawful agreements in restraint of trade in the State of Utah. Specifically, Defendants' combinations or conspiracies detrimentally affected price competition in the State of Utah for crude oil and Heating Oil by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Heating Oil prices in Utah at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah. Accordingly, Plaintiffs and members of the Class seek all relief available under UTAH CODE ANN. §76-10-3101 *et seq*.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**COUNT 48: VERMONT**
**(On Behalf of Class Members that Purchased Heating Oil in Vermont)**

225.     Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and Heating Oil was restrained, suppressed, and eliminated throughout the State of Vermont; (2) Heating Oil prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Classes, once certified;

B.     The Court adjudge and decree that the acts of Defendants, as set forth above, are illegal and unlawful, and constitute a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of various state antitrust, unfair competition, and consumer protection laws as alleged above;

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

78

D.      The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Classes for treble the amount of damages sustained by Plaintiffs and the Classes as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.      The Court award Plaintiffs and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Date: February 15, 2024                    Respectfully submitted,


                                            */s/ Matthew T. Dushoff*
                                            MATTHEW T. DUSHOFF, ESQ.
                                            Nevada Bar No. 004975
                                            WILLIAM A. GONZALES, ESQ.
                                            Nevada Bar No. 015230
                                            **SALTZMAN MUGAN DUSHOFF**
                                            1835 Village Center Circle
                                            Las Vegas, Nevada 89134
                                            Telephone:  (702) 405-8500
                                            Facsimile:  (702) 405-8501
                                            mdushoff@nvbusinesslaw.com
                                            wgonzales@nvbusinesslaw.com

William G. Caldes (*pro hac vice forthcoming*)
Jeffrey L. Spector (*pro hac vice forthcoming*)
Diana J. Zinser (*pro hac vice forthcoming*)
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 466-6611
bcaldes@srkattorneys.com
jspector@srkattorneys.com
dzinser@srkattorneys.com

Garrett D. Blanchfield (*pro hac vice forthcoming*)
Roberta A. Yard (*pro hac vice forthcoming*)
**REINHARDT WENDORF & BLANCHFIELD**
332 Minnesota Street, Suite W1050
St. Paul, MN  55101
Tel:  (651) 287-2100
g.blanchfield@rwblawfirm.com
r.yard@rwblawfirm.com

David P. McLafferty (*pro hac vice forthcoming*)
**MCLAFFERTY LAW FIRM, P.C.**
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000
dmclafferty@mclaffertylaw.com

*Counsel for Plaintiffs and the Proposed Classes*